353 F.3d 1125
 EMPLOYERS TEAMSTERS LOCAL NOS. 175 AND 505 PENSION TRUST FUND; Clarence E. Long; Gary Mucica; Peter C. Schroder, Jr., Plaintiffs-Appellants,
v.
The CLOROX COMPANY; G. Craig Sullivan; Gerald E. Johnston; Karen M. Rose; William V. Stephenson; First Brands Corp.; Thomas H. Rowland; Donald A. Desantis, Defendants-Appellees.
 No. 02-17474.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted December 5, 2003 — San Francisco, California.
 Filed January 7, 2004.
 
 COPYRIGHT MATERIAL OMITTED Susan K. Alexander, Milberg Weiss Bershad Hynes & Lerach LLP, San Francisco, CA, for the plaintiffs-appellants.
 Jordan Eth, Morrison & Foerster LLP, San Francisco, CA, for the defendants-appellees.
 Appeal from the United States District Court for the Northern District of California; Samuel Conti, District Judge, Presiding. D.C. No. CV-99-04471-SC.
 Before MYRON H. BRIGHT,* DOROTHY W. NELSON, and PAMELA ANN RYMER, Circuit Judges.
 Opinion by Judge Rymer.
 OPINION
 RYMER, Circuit Judge.
 
 
 1
 Investors who purchased stock of The Clorox Company between October 19, 1998 and August 11, 1999 appeal the district court's summary judgment and judgment on the pleadings in their action against Clorox, First Brands Corporation, and several officers of the two companies[1] (collectively Clorox), for violations of Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, as amended by the Private Securities Litigation Reform Act (PSLRA), 15 U.S.C. § 78u-4. In its published order, In re Clorox Company Securities Litigation, 238 F.Supp.2d 1139 (N.D.Cal.2002), the court limited discovery to two viable claims having to do with statements allegedly made by Clorox officers about its merger with First Brands and as to them, held that the statements were either not made as alleged or were forward-looking statements accompanied by meaningful disclaimers of uncertainty or caution that were protected by the safe harbor provision of the PSLRA, 15 U.S.C. § 78u-5(c), and the "bespeaks caution" doctrine, and granted judgment on the pleadings for the remainder of Investors' claims. We have jurisdiction pursuant to 28 U.S.C. § 1291, and affirm.
 
 
 2
 * Without belaboring the factual background, which we construe in Investors' favor, First Brands began searching for a potential buyer in early 1998. To enhance its financial attractiveness, the company engaged in a practice that Investors call "trade loading" — trade promotions that inflated sales by inducing customers to stock inventories in excess of consumer consumption experience. These promotions boosted sales by committing to retailers that First Brands would rebate up to 35% of the trade-loaded shipments in future quarters. This meant that First Brands recorded the full revenue of the trade-loaded shipments in the immediate term, but deferred recognition of the rebates or promotional allowances for the future, thereby artificially inflating First Brands' short term profits.
 
 
 3
 Clorox, which was looking for a possible acquisition in the spring of 1998, targeted First Brands and discovered its trade-loading practices. Nevertheless, Clorox decided to acquire First Brands in a stock-for-stock transaction. The exchange rate was determined by the average price of Clorox stock during a preset "pricing period."
 
 
 4
 On the day the merger was announced, October 19, 1998, Clorox's President and CEO, Craig Sullivan, told brokers on a conference call that "[w]e expect that the transaction will be immediately accretive to earnings per share before one-time charges associated with the merger, and will accelerate the growth rate above revenue and earnings per share for Clorox."
 
 
 5
 Clorox learned in January 1999 that the First Brands trade promotions would not expire for up to 18-24 months. The problem was discussed internally. On March 3, Gerald E. Johnston, Clorox's Chief Operating Officer, gave a scripted Power-Point presentation at a Merrill Lynch conference, and during the month he, Sullivan, and Karen E. Rose, Clorox's Chief Financial Officer, spoke to analysts at Donaldson, Lufkin & Jenrette, NationsBank Montgomery Securities, Morgan 199 Stanley, and Paine Webber about the First Brands inventory problem. Merrill Lynch reported on March 4 that "[Clorox] has identified $150 million in excess inventory (could be less than this amount) that it will work through the system over the next 18 months;" and that "First Brands has trade promotion plans through the end of calendar 1999 that can not be undone." Paine Webber reported on March 22 that "we recently met with the management of Clorox and while we walked away believing that its long-term fundamentals have never been better ... [t]he outlook over the next six months is less visible and predictable than at any point in the past few years.... However, we believe these issues are largely transitory in nature and should last for two or so quarters."
 
 
 6
 Clorox reported its 3Q99 results on April 22, and Rose participated in a conference call with analysts, money and portfolio managers, institutional investors, and large Clorox shareholders. Among other things, she stated: "[W]e're obligated to live with First Brand's old programs and spending levels against the trade in some form until January 2000. It will be at that time, similar to what we saw with Armor All [a prior acquisition], that you will begin to see the beginning of the conversion to our programs." She also said that clearing out the inventory would involve a "slow bleed" and would be a "year-long process approximately." Analysts variously reported that fixing the First Brands' excessive inventory problem would take over three quarters, or one year, or should begin to pay off for Clorox in the second half of fiscal 2000.
 
 
 7
 When Clorox's stock price declined from $104 per-share on August 11, 1999, to $83-3/4 on August 12, 1999, Sullivan wrote shareholders that "the softness in sales of First Brands' products was mainly the result of our eliminating inefficient trade promotion practices that had induced trade customers in previous years to stock inventories well in excess of consumption," and that "none of this was news to us."
 
 
 8
 This action was filed on October 6, 1999. The district court granted Clorox's motion to dismiss the second amended complaint on June 13, 2001, reasoning that the complaint failed to adequately allege scienter. Investors filed a third amended complaint, attaching to it declarations of former Clorox employees Gary Mucica and Joseph O'Connor. The declarations generally state that Clorox knew about the "unbelievably high" First Brands trade promotions both before and after the acquisition; that shortly after the closing in January 1999, Clorox officers believed the company had "gotten in over its head;" and that Clorox knew the acquisition would not be immediately accretive to sales and earnings. On March 4, 2002, the district court denied Clorox's motion to dismiss the third amended complaint, indicating that statements from the March 1999 Merrill Lynch conference and the April 1999 conference call adequately alleged scienter and should be allowed to proceed. However, the court found that the other allegations in the complaint still failed to adequately allege scienter.
 
 
 9
 The parties disagreed about the scope and timing of discovery. Clorox's position, ultimately sustained by the district court, was that Investors were only entitled to discovery about the March and April 1999 statements; Investors believed they should have complete discovery because the court had upheld the complaint in its entirety.
 
 
 10
 On September 27, 2002, Clorox moved for partial summary judgment on the Johnston and Rose statements, and for judgment on the pleadings on the remaining claims. Investors filed a motion to compel discovery on all claims, and sought a continuance pursuant to Rule 56(f) of the Federal Rules of Civil Procedure. The district court denied a continuance, and granted Clorox's motion for summary judgment on the ground that Investors produced no evidence that Johnston made the alleged "temporary or transitory" statement on March 3, 1999, and that Rose's statements were within the PSLRA's safe harbor provision and the "bespeaks caution" doctrine. It granted judgment on the pleadings because the third amended complaint failed to allege scienter under PSLRA standards with respect to Sullivan's "immediately accretive" statement. Investors timely appealed.
 
 II
 
 11
 Investors argue that the district court abused its discretion in denying a continuance pursuant to Fed.R.Civ.P. 56(f).[2] To prevail under this Rule, parties opposing a motion for summary judgment must make "(a) a timely application which (b) specifically identifies (c) relevant information, (d) where there is some basis for believing that the information sought actually exists." VISA Int'l Serv. Ass'n v. Bankcard Holders of Am., 784 F.2d 1472, 1475 (9th Cir.1986). "The burden is on the party seeking additional discovery to proffer sufficient facts to show that the evidence sought exists, and that it would prevent summary judgment." Chance v. Pac-Tel Teletrac Inc., 242 F.3d 1151, 1161 n. 6 (9th Cir.2001). "The district court does not abuse its discretion by denying further discovery if the movant has failed diligently to pursue discovery in the past, or if the movant fails to show how the information sought would preclude summary judgment." Cal. Union Ins. Co. v. Am. Diversified Sav. Bank, 914 F.2d 1271, 1278 (9th Cir.1990) (citations omitted).
 
 
 12
 Clorox's motion for summary judgment went only to whether Johnston or Rose said that problems with First Brands were temporary or transitory, and to whether Rose's statements were protected. In support of their Rule 56(f) application, Investors argued that they needed all documents concerning the March 22, 1999 Paine Webber report that described the First Brands inventory problem as "largely transitory in nature," the March 4, 1999 Merrill Lynch report following the conference, and the March 17, 1999 Morgan Stanley report that stated that the transition from "inventory destocking" was expected to be "completed in calendar 1999." They also maintained that discovery was necessary regarding what Clorox officers knew at the time the false statements were made. In addition, counsel's declaration explained that Investors were waiting until they had reviewed documents before noticing depositions, including those of Johnston and Rose, but expected to do so.
 
 
 13
 Clorox had produced all documents in its possession related to the March 4, 1999 conference. Investors had issued third-party subpoenas to analysts in April 1999, but no follow up had occurred nor had depositions been noticed even after Clorox gave notice (in June) of its plans to move for partial summary judgment. This calls their diligence into question. Regardless, the district court could reasonably find that Investors' showing of need fell short of identifying any material that would suggest that Johnston or Rose said anything other than what their declarations aver and the script (in Johnston's case) or transcript (in Rose's case) reveal. Nothing in the Merrill Lynch March 4, 1999 report indicates that Johnston spoke beyond his script or said that First Brands inventory problems were temporary or transitory; the report does not attribute any such comment to Johnston, and does not appear to paraphrase anything that Johnston said. The March 22, 1999 Paine Webber report and March 17, 1999 Morgan Stanley report were written by analysts who were not at the March 3 conference; both were issued before the Rose telephone conference, so neither report is relevant to either issue on summary judgment. And, as the district court held, Investors were not entitled to discovery bearing on scienter or other claims raised in the complaint because the motion for summary judgment focused narrowly on whether Johnston characterized the inventory problems as temporary or transitory and whether the statements that Rose made on April 22 were protected as a matter of law. For these reasons, we see no abuse of discretion in denying the requested continuance.
 
 III
 
 14
 Investors argue that even apart from being premature, summary judgment should not have been granted because the court overlooked eight other analyst reports suggesting that Clorox communicated the same message — that the First Brands inventory problem had been quantified and would be short-term — on other occasions in addition to March 3 and April 22, 1999. This, in Investors' view, creates a triable issue of fact that other false statements were made. They make a related contention that the court should not have accepted declarations by Johnston and Rose that they "do not recall stating" that the First Brands inventory problem was temporary or transitory as evidence that they in fact said nothing false during follow-up conversations. However, we do not believe that these points are properly before us. The district court held that claims based on any statement except for those made on March 3 and April 22 fail to meet the pleading requirements of the PSLRA, and Investors have not appealed this part of the ruling. Also, Clorox's motion for partial summary judgment was directed only to statements made on these two occasions. In these circumstances, analysts' reports and declarations about different conversations on different dates are not relevant.
 
 
 15
 Beyond this, Investors fault the district court for having held that no evidence exists that Johnston made false statements at the March 3 conference, when they offered the Merrill Lynch report which states that "First Brands has trade promotion plans through the end of calendar 1999" and that "CLX has identified $150 million in excess inventory." Neither of these statements was in Johnston's script but, as the district court concluded, the analyst's statement about impact was consistent with allegedly concealed information that the problem would extend into fiscal year 2000, and nothing in the report suggests that it was Johnston's representation rather than the analyst's independent judgment that the problem would be resolved in the near term.
 
 
 16
 Johnston's script, slides, and declaration show that he did not say that the problems with First Brands were temporary or transitory. As Clorox established that there was no evidence to support Investors' claim that Johnston stated that the inventory problem was minor and temporary, summary judgment was properly entered on the March 3 statements. See Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).
 
 IV
 
 17
 Investors do not challenge the district court's determination that Rose's statements were forward-looking. Rather, they argue that the court incorrectly held that knowingly false statements made by Rose during her April 22 conference call are not actionable as long as they are short, and that it improperly relied on limited and general cautions to protect Clorox under the PSLRA's safe harbor and the "bespeaks caution" doctrine.
 
 
 18
 Although Investors cite a number of statements in the same vein, the most representative and problematic are Rose's response to a question about the impact the trade deals inventory problem would have: "Regarding what happens when we move to our own programs, this is going to be, you know, a slow bleed over this year where we'll keep the trade deals, but we aren't going to be jamming, just as I just described to you happened here in Third Quarter. So it's going to be a year-long process approximately, getting that extra inventory out of the trade." It is with respect to these statements that the court observed that Rose "spoke only a couple of sentences and provided an approximate timetable." 238 F.Supp.2d at 1145. Investors submit that the court's holding that "short whoppers don't count" is error, but we read its decision as turning on context rather than word count.
 
 
 19
 The court held that in context, Rose's timetable estimate was qualified by "approximately" and accompanied by other cautionary statements that were meaningful: her disclaimer of certainty at the beginning of the call, her reference to additional cautions in Clorox's June 30, 1998 Form 10K filing, and her indication that Clorox anticipated it would be losing money on First Brands for several quarters. Investors maintain that the warnings were not meaningful because reasonable minds could differ as to the efficacy of the cautions in light of the specificity and intensity of the false statements. See Provenz v. Miller, 102 F.3d 1478, 1493 (9th Cir.1996) (holding that "[s]ummary judgment based on the `bespeaks caution' doctrine is only appropriate `when reasonable minds could not disagree as to whether the mix of information in the document is misleading'") (quoting Fecht v. Price Co., 70 F.3d 1078, 1082 (9th Cir.1995)). We disagree.
 
 
 20
 "The bespeaks caution doctrine provides a mechanism by which a court can rule as a matter of law (typically in a motion to dismiss for failure to state a cause of action or a motion for summary judgment) that defendants' forward-looking representations contained enough cautionary language or risk disclosure to protect the defendant against claims of securities fraud." In re Worlds of Wonder Sec. Litig., 35 F.3d 1407, 1413 (9th Cir.1994) (internal quotation and citation omitted). The PSLRA created a statutory version of this doctrine by providing a safe harbor for forward-looking statements identified as such, which are accompanied by meaningful cautionary statements.[3] See 15 U.S.C. § 78u-5(c); Grossman v. Novell, Inc., 120 F.3d 1112, 1121 (10th Cir.1997) (calling the safe harbor a statutory form of the doctrine) (citing Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1213 & n. 23 (1st Cir.1996)); Helwig v. Vencor, Inc., 251 F.3d 540, 547-48 (6th Cir.2001) (stating that the safe harbor for forward-looking statements is based on the judicial bespeaks caution doctrine).
 
 Rose began the conference call by stating:
 
 21
 Now before I begin, I need to remind you that any forward-looking statements made on this call represent our best judgment as to what may occur in the future. The Company's actual results will depend on a number of competitive and economic factors, some of which may be outside the control of the Company. We refer you to our Form 10K filing for the year ended June 30, 1998, filed with the SEC last September, for a discussion of the most important of those factors.
 
 
 22
 The 10-K, in turn, cautioned that there can be no assurance that Clorox will be able to successfully integrate acquisitions into its operations and that risks in integration of acquisitions could cause results to differ from expectations. In addition to qualifying her timetable estimate by "approximately," many of Rose's statements were cautions in themselves. Rose told listeners that First Brands had a trade promotion program that encouraged the trade to stock extra inventory that Clorox wanted to get this out of the system, and that First Brands had a routine of pushing sales to levels not warranted by consumption patterns, which Clorox also wanted to stop. She said that First Brands had binding trade promotion programs until January 2000. In comparing the First Brands acquisition to the prior acquisition of Armor All, Rose warned that "First Brands is significantly bigger than Armor All was in relation to our total portfolio, so as we go through the same evolution of that business becoming a part of the Clorox Company, its impact is much greater than Armor All was.... First Brands, as you can see from this Quarter, will definitely be noticeable in its impact on total Company." Also: "We expect to see a slower growing First Brands business again, primarily due to the trade loading impact." Thus, Rose identified the important problems with First Brands that could cause her estimate of the approximate timetable to be off. The safe harbor requires that the cautionary language mention "important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 77z-2(c)(1)(A)(i). This her statements did.
 
 
 23
 Finally, Investors argue that the content of the Form 10K filing to which Rose referred at the beginning of the conference call should not have been considered because only cautionary statements actually accompanying the false statements can be considered as a defense. For this Investors rely on 15 U.S.C. § 78u-5(c) and In re Stac Elecs. Sec. Litig., 89 F.3d 1399 (9th Cir.1996). However, Stac was a pre-PSLRA case that was not applying the safe harbor provision, and the PSLRA does not require that the cautions physically accompany oral statements. Instead, if other requirements are met, § 78u-5(c)(2)(B)(i) provides that for forward-looking oral statements such as Rose's the safe harbor extends to an oral statement that "additional information concerning factors that could cause actual results to materially differ from those in the forward-looking statement is contained in a readily available written document." 15 U.S.C. § 78u-5(c)(2)(B)(i).
 
 
 24
 Accordingly, we conclude that sufficient warnings accompanied the timetable estimate, and Clorox is protected from liability under the safe harbor provision.
 
 V
 
 25
 Investors submit that judgment on the pleadings should not have been granted on their allegation that Sullivan knew the falsity of his October 19, 1998 statement that the First Brands merger would be "immediately accretive" because the complaint, and attached declarations of former Clorox employees, aver that Clorox knew about the problematic trade practices before October 1998, that Clorox knew about First Brands' "unbelievably high" trade promotions before the acquisition was announced, and that Sullivan later told investors that "none of this was news to us." Investors also contend that the district court, in holding that scienter was inadequately pled under the PSLRA, overlooked Sullivan's admission that he knew about the First Brands problem.
 
 
 26
 Under the PSLRA, the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B). The PSLRA also requires that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." Id. § 78u-4(b)(2); see also Ronconi v. Larkin, 253 F.3d 423, 429 (9th Cir.2001) (stating that a complaint must "plead with particularity both falsity and scienter"). The requisite state of mind, at a minimum, is deliberate or conscious recklessness. In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 979 (9th Cir. 1999). However, if the challenged statement is forward-looking, "the plaintiffs must have alleged facts that would create a strong inference that the defendants made the forecasts with `actual knowledge... that the statement[s were] false or misleading' at the time made." In re Vantive Corp. Sec. Litig., 283 F.3d 1079, 1091 (9th Cir.2002) (ellipses and alteration in original) (quoting 15 U.S.C. § 78u-5(c)(1)(B)(i)).
 
 
 27
 While we accept Investors' allegations as true, as in any motion to dismiss or for judgment on the pleadings, the heightened pleading standard under the PSLRA means that, "when determining whether the plaintiffs have shown a strong inference of scienter, the court must consider all reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs." Gompper v. VISX, Inc., 298 F.3d 893, 897 (9th Cir. 2002). Here, neither declaration attached to the complaint indicates anything more than that Clorox knew of the trade promotions at First Brands before its acquisition, and that they were "unbelievably high." Neither declaration sets forth facts that strongly imply that Sullivan made the statement in deliberate or conscious disregard of information that the transaction would not immediately add earnings per share to Clorox's results; no facts are alleged that support an inference that Sullivan or anyone at Clorox knew the extent of the trade promotions work-out problem when the acquisition was announced. To the contrary, in his declaration Mucica states that after the closing in January 1999, "[s]enior management was constantly requesting updated information on the trade promotions because Clorox still had not gotten a grip on the extent of the trade promotions, the spend levels and the amount of deferred spending that had not been adequately accrued for by First Brands."
 
 
 28
 Nor does the allegation about Sullivan's August 12, 1999 statement to shareholders that "none of this was news to us" raise a strong inference of scienter. The complaint alleges:
 
 
 29
 In Sullivan's letter to shareholders included in Clorox's 99 Annual Report, he stated "the softness in sales of First Brands' products was mainly the result of our eliminating inefficient trade promotion practices that had induced trade customers in previous years to stock inventories well in excess of consumption," and that "none of this was news to us." It was also stated in the 99 Annual Report that First Brands' inefficient promotional practices "artificially boosted" sales of Glad bags and wrap in 98.
 
 
 30
 Investors claim that by this communication Sullivan admitted that he knew that the merger would not be immediately accretive, but all that it admits is that Clorox knew that First Brands had trade promotion practices which it set about eliminating. The statement alleged does not say, or strongly imply, that Sullivan knew in October 1998 that the acquisition would not add earnings per share. As the district court concluded, the statement showed that the acquisition would entail some costs, not that the costs would exceed the predicted benefits.
 
 
 31
 AFFIRMED.
 
 
 
 Notes:
 
 
 *
 Honorable Myron H. Bright, Senior United States Circuit Judge for the Eighth Circuit, sitting by designation
 
 
 [1]
 Clorox President, Chief Executive Officer and Chairman G. Craig Sullivan, Clorox Group Vice President Gerald E. Johnston, Clorox Group Vice President and Chief Financial Officer Karen M. Rose, First Brands Chairman, President and CEO William V. Stephenson, First Brands Executive Vice President Thomas H. Rowland, and First Brands Senior Vice-President and CFO Donald A. DeSantis
 
 
 [2]
 Rule 56(f) provides:
 Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.
 
 
 [3]
 The safe harbor provision in relevant part states:
 Except as provided in subsection (b) of this section, in any private action arising under this chapter[15 USCS §§ 78a et seq.] that is based on an untrue statement of a material fact or omission of a material fact necessary to make the statement not misleading, a person referred to in subsection (a) of this section shall not be liable with respect to any forward-looking statement, whether written or oral, if and to the extent that —
 (A) the forward-looking statement is —
 (i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement.
 15 U.S.C. § 78u-5(c). The term "forward-looking statement" means:
 (A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;
 (B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;
 (C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;
 (D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C);
 (E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer; or
 (F) a statement containing a projection or estimate of such other items as may be specified by rule or regulation of the Commission.
 15 U.S.C. § 78u-5(i).