In re: APPLE COMPUTER, INC.,

Hawaii Structural Iron Workers Pension Trust Fund; et al., Plaintiffs—Appellants,

v.

Apple Computer, Inc.; et al., Defendants—Appellees.

No. 03–16614.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 17, 2005.

Decided April 4, 2005.

█

---

** This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36–3.

Sanford Svetcov, Esq., Patrick J. Coughlin, Esq., Susan K. Alexander, Esq., Eli Greenstein, Esq., Lerach Coughlin Stoia Geller Rudman & Robbins, LLP, San Francisco, CA, for Plaintiffs–Appellants.

William S. Lerach, Esq., Thomas E. Egler, Esq., Lerach Coughlin Stoia Geller Rudman & Robbins, LLP, San Francisco, CA, for Plaintiffs–Appellants and Defendants–Appellees.

George A. Riley, DCA, Robert C. Vanderet, Esq., Seth Aronson, Esq., Gail K. Johnson, Esq., O'Melveny & Myers, LLP, San Francisco, CA, for Defendants–Appellees.

Before: ALARCON, SILVERMAN, and BEA, Circuit Judges.

## MEMORANDUM *

Plaintiffs-appellants Hawaii Structural Iron Workers Pension Trust ("plaintiffs") *et al.* brought this putative class action against defendants-appellees Apple Computer, Inc. ("Apple") and Apple's Chief Executive Officer Steven P. Jobs ("Jobs") for violations of securities laws. Plaintiffs allege Jobs is a controlling person at Apple under section 20(a) of the Securities Ex-

---

* This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36–3.

change Act of 1934, 15 U.S.C. § 78t(a); this defendants do not dispute.

Plaintiffs appeal from the district court's order granting the defendants' motion to dismiss without leave to amend the plaintiffs' First Amended Consolidated Complaint (the "Complaint"), based on the district court's finding that plaintiffs failed to allege facts showing defendants made false statements with the scienter required under the Private Securities Litigation Reform Act (the "PSLRA"). Fed.R.Civ.P. 9(b), 12(b)(6). Plaintiffs' Complaint alleged that defendants violated section 10(b) of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. § 78j(b), and Rule 10b–5, promulgated thereunder. Plaintiffs also appeal the denial of their post-judgment motion to alter the judgment to allow them leave to amend their Complaint. FED. R. CIV. P. 59(e).

Plaintiffs seek to represent all purchasers of Apple common stock between July 19, 2000 and September 28, 2000 (the "class period"), which was part of Apple's fourth quarter of its fiscal year for 2000 ("4Q00").

The district court properly dismissed plaintiffs' Complaint with prejudice because the allegations therein do not raise a strong inference defendants (1) made their forward looking statements with actual knowledge those statements were false at the time they made those statements as required; and (2) made their non-forward looking statements intentionally false or with deliberate recklessness as to the statement's falsity, as required by the heightened pleading requirements of the PSLRA and our decisions. Accordingly, we affirm the district court's order.

# I

We review de novo the district court's dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).

*Gompper v. VISX, Inc.,* 298 F.3d 893, 895 (9th Cir.2002). We review the district court's denial of plaintiffs' post-judgment motion for leave to amend their Complaint for abuse of discretion. *Id.* at 898.

# II

To plead securities fraud under Section 10(b) of the 1934 Act or Rule 10b–5, plaintiffs must allege: "(1) a misstatement or omission (2) of material fact (3) made with scienter (4) on which [plaintiffs] relied (5) which proximately caused [the plaintiffs'] injury." *DSAM Global Value Fund v. Altris Software, Inc.* 288 F.3d 385 (9th Cir.2002).

Under the PSLRA, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" with respect to each act or omission. *See* 15 U.S.C. § 78u–4(b)(2); *In re Vantive Corp. Sec. Litig.,* 283 F.3d 1079, 1084 (9th Cir. 2002). By requiring particularized, detailed allegations showing a strong inference of scienter, the PSLRA was intended to "eliminate abusive and opportunistic securities litigation." *Gompper,* 298 F.3d at 897.

As to *forward looking statements* made by the defendants, such as Anderson's revenue projections and Jobs' projections regarding Cube sales, plaintiffs must allege facts demonstrating a strong inference defendants made those statements with *actual knowledge that they were false.* 15 U.S.C. § 78u–5(c)(1)(B)(I); *In re Vantive Corp. Sec. Litig.,* 283 F.3d 1079, 1085 (9th Cir.2002). A forward looking statement is any statement regarding "(1) financial projections, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions 'underlying or related to' any of these issues." *See No. 84 Employer–Teamster*

*Joint Council Pension Trust Fund v. America West Holding Corp.*, 320 F.3d 920, 936 (9th Cir.2003). A forecast is actionably false if " 'there is no reasonable basis for the belief' " or " 'the speaker is aware of undisclosed facts tending seriously to undermine the statements' accuracy." *Provenz v. Miller*, 102 F.3d 1478, 1487 (9th Cir.1996) (citation omitted).

As to *non-forward looking statements* made by the defendants, such as Oppenheimer's statement that the K–12 sales force transition was "progressing nicely", plaintiffs must allege facts demonstrating a strong inference defendants made those statements *intentionally false or with deliberate recklessness as to the statements' falsity. Id.*

Claims that a speaker "could have" or "should have" known that the statements were false are insufficient to satisfy the standard for either forward looking or non-forward looking statements. "Negligence, even gross negligence, does not rise to the level of the nefarious mental state necessary to constitute securities fraud under the PSLRA." *DSAM*, 288 F.3d at 391.

A complaint will be dismissed under Federal Rule Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted where the plaintiff can prove no set of facts in support of the claim which would entitle him to relief. *See Williamson v. Gen'l Dynamics Corp.*, 208 F.3d 1144, 1149 (9th Cir.2000).

## III

### Anderson's Revenue Projections

In the summer of 2000, Apple held a conference, called Mac World, to tell its investors about its upcoming products. During a conference call held on July 18, 2000, the night before the Mac World Conference and the start of the putative class period, Apple announced results for its third quarter ending June 30, 2000. Apple reported $1.83 billion in revenues and $163 million in earnings.

During the July 18th call, Apple's Chief Financial Officer, Fred Anderson, stated that Apple was "targeting over 10% sequential growth" for the fourth quarter and "I'm saying over 10%, so I think it will be double digits." This would translate into a projected revenue of about $2 billion. Anderson, however, also stated that "margins would decline 2%–3% to 26.8%–27.8%, and operating expenses would increase by $15 million with a flat tax rate."

■ Plaintiffs must show that Apple's problems were so widespread and severe that Anderson knew this revenue target was unattainable when made. 15 U.S.C. § 78u–5(c)(1)(B)(I); *Vantive*, 283 F.3d at 1085; *Ronconi*, 253 F.3d at 429. The district court held that plaintiffs failed to plead facts sufficient to show that Anderson made this revenue projection with actual knowledge it was false. The district court is correct. Plaintiffs' only allegation is that because Anderson was Apple's Chief Financial Officer, he had a duty to know Apple's correct financial condition. Plaintiffs' allegations at most allege that Anderson was negligent in the performance of his job duties, but negligence is not enough. *DSAM*, 288 F.3d at 391. We have held that "[t]he existence of a 'reasonable inference' [as to an officer's knowledge of 'facts critical to a business' core operations'] however, does not satisfy the PSLRA's requirement that Plaintiffs allege scienter on the part of Defendants." *In re Read–Rite Corp. Securities Litig.*, 335 F.3d 843, 848–49 (9th Cir.2003).

### K–12 Educational Sales

During the same July 18, 2000 conference call, Apple's Controller, Peter Oppenheimer, stated that Apple had reorganized

its sales force for colleges from non-employee sales agents the year before into employee sales agents. A similar organizational change of the K–12 sales force was "progressing nicely." Anderson, who was present, did not correct Oppenheimer's statement.

The district court correctly found that the plaintiffs' Complaint did not sufficiently allege that Oppenheimer knew on July 18th that, due to difficulties with such sales force reorganization, sales would drop in the next three months.

The Tenth Circuit held that similar statements by an officer that a company had "substantial success" integrating its sales force, that a merger was moving "faster than we thought," and that "[b]y moving rapidly to a fully integrated sales force, we are leveraging our combined knowledge and expanding scope of network solutions" are "statements of corporate optimism" and are not actionable. *Grossman v. Novell, Inc.,* 120 F.3d 1112, 1121–22 (10th Cir.1997).

Plaintiffs allege that Oppenheimer should have known his statement was false and that, because he is the Controller, he was under a duty to investigate how the transition was going before issuing any such statement. At most this alleges negligence on Oppenheimer's part, not the required scienter. Mere access to contradictory information is insufficient to allege the deliberate recklessness required. *See Lipton v. Pathogenesis Corp.,* 284 F.3d 1027, 1035–36 (9th Cir.2002).

Additionally, plaintiffs allege that the sales force transition began during the third quarter of 2000, and that sales during that quarter were quite a bit higher than before. Plaintiffs also allege that most of the education sales historically took place at the end of September. Therefore, from Apple's viewpoint on July 18th, the sales force transition had progressed nicely—third quarter sales were up.

Plaintiffs fail to allege any specific facts showing that Oppenheimer knew his statement was false when he made it, yet they argue that Oppenheimer must have known at the beginning of July that the sales force reorganization was going poorly because of Jobs' observation, made 10 months later, that the transition was a "train wreck" in large part because the transition began just before the period during which schools historically made most of their purchases—the start of the school year. We have rejected similar allegations based on post-class-period statements that do not specify when the defendant learned what he or she currently knows. *In re Read–Rite Corp.,* 335 F.3d 843, 847 (9th Cir.2003); *Employers Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co.,* 353 F.3d 1125, 1134–35 (9th Cir.2004).

As we reasoned in *Ronconi,* "People have underestimated the value of salespeople since time immemorial. Alleging in substance that [the defendant] underestimated the difficulties it would face if it fired 300 salespeople does not make out a fraud case." 253 F.3d at 433.

### Jobs' Statements Regarding the Cube

On July 19, 2000, the first day of the Mac World Conference and the putative class period, Jobs introduced several new products at the conference: the Cube, the Dual Processor Power Mac, and some new iMac models.

In talking about the Cube, Jobs told the audience "[t]he G4 Cube is ... the most beautiful product [Apple] ever designed." He also said that "[a]ll models are available in early August" and the Cube and Power Mac would drive Apple's revenues in the near term and throughout fiscal

years 2001–2002. As promised, the Cube began "volume shipments" in August.

Most importantly, Jobs told the audience that day that he projected Apple would sell 800,000 Cubes in its first year—with 150,000 of those sales in 4Q00. The day Jobs made this statement, Apple was 19 days into 4Q00.

Jobs reaffirmed his estimate that Apple would sell 150,000 Cubes in 4Q00 on August 30, 2000—more than half-way through 4Q00—when he told investors at the Seybold computer conference that Apple was "on track" to meet that target.

On September 13, 2000—with only 17 days left in 4Q00—Jobs said that he was "extremely happy" with sales of the Cube and that Apple's new products gave it "the strongest product line that Apple has ever had." In an interview on CNBC that same day, he said, "I think we're going to hit our forecasts this quarter, so if [Cubes are] hard to find, I think that's because demand is greater than we thought it would be. . . ." Just before this statement, Jobs also said, "[W]e don't really predict revenue and earnings."

In the end, Apple only sold 107,000 Cubes during 4Q00, not the 150,000 Jobs had predicted. Unlike Jobs' purely subjective statement that the Cube was the "most beautiful product [Apple] ever designed," his projection that Apple would sell 150,000 Cubes in 4Q00 is a concrete projection that an investor may have relied upon.

The Cube was marketed, in part, for its looks. It had the micro-processor encased in a clear cube. Hence, its name. But during the manufacture, Apple encountered problems with mold lines and tiny cracks in the casing, which marred its appearance. Additionally, there were problems with an overly-sensitive power switch. Whenever an electrical source passed over the switch, the power turned off on some models, often causing a loss of data.

The district court found plaintiffs had pleaded facts which showed Jobs had access to, and visited, production installations and received production reports. However, there were no facts pleaded to show Jobs observed and knew of the extent of the production problems, or learned of them from a report.

■ The plaintiffs alleged that according to CW 37, a former Apple materials manager for the G4 production line, Jobs visited the Cube's development laboratory at least once a week from May to August, 2000. CW 37 also told plaintiffs that Trango, Apple's lead manufacturing coordinator, told CW 37 that he had discussed the Cube's manufacturing problems with Jobs. Plaintiffs insist that the district court overlooked their allegations about CW37 and what Trango told CW 37. To the contrary, the district court's order discussed at length both CW37 and the allegations concerning Trango. The district court correctly determined that scienter could not be inferred from these allegations because plaintiffs failed to allege the contents of "specific memos, messages or meetings" that Trango or anyone else allegedly had with Jobs, nor when these discussions took place. Although plaintiffs attach the witness summaries of several confidential witnesses that demonstrate the engineers at Apple knew there were production problems with the Cube, again these witness statements do not establish exactly what Jobs knew, nor when he knew it, to allege that Jobs knew his predictions were false when he made them.

Plaintiffs also alleged that a "product defect memo" was circulated to employees and unspecified "senior managers and executives" and that CW 37 received a copy. The Complaint fails to provide quotations

or substantive detail from the memo. Instead, it simply claims that the memo itself is detailed. But alleging that a memo is detailed and providing those details, are two different things entirely. The district court correctly held that plaintiffs were required to provide these details. *Silicon Graphics*, 183 F.3d at 984.

Because design, marketing and manufacturing problems are common to business, a securities fraud claim must do more than allege the existence of such problems; plaintiffs must allege with particularity that a speaker knew that the severity, timing and extent of such problems rendered the statement false when made. *Ronconi*, 253 F.3d at 433. As the district court found, plaintiffs failed to allege Jobs' knowledge of the Cube's manufacturing problems when he made his first statements on July 19, 2000. And, although plaintiffs do allege that Jobs learned that Apple was having significant problems in the manufacture of the Cube during 4Q00, they fail to allege with specificity when Jobs learned this information, exactly what information was conveyed to Jobs, or that Jobs knew the extent of the problems. The Complaint refers generally to conversations, memos and reports about the Cube, but it does not allege the content of any of these. Such allegations are insufficient. *America West*, 320 F.3d at 942 n. 20.

A corporation is deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement has the requisite level of scienter at the time that he or she makes the statement. *Nordstrom, Inc. v. Chubb & Son, Inc.*, 54 F.3d 1424, 1435–36 (9th Cir.1995). We have squarely rejected the concept of "collective scienter" in attributing scienter to an officer and, through him, to the corporation. *Id.*

Plaintiffs' allegations show that Jobs expected Apple's employees to address and fix any problems that arose—not that he knew Apple would sell fewer Cubes than he expected. *See Ronconi*, 253 F.3d at 435 ("Problems and difficulties are the daily work of business people. That they exist does not make a lie out of any of the alleged false statements."). That reasonable inference is further confirmed by Apple's execution of long-term supply contracts for Cube parts, contracts that Apple was forced to cancel at great expense when Apple did not sell as many Cubes as predicted.

**The Power Mac**

■ At the Mac World conference on July 19, 2000, Jobs said that "because two brains are better than one . . . this is going to be the best Power Mac ever." Plaintiffs claim that Apple marketed the Power Mac knowing that consumers would not pay the higher price charged for an extra microprocessor when there were few programs that could take advantage of the second micro-processor. But Apple had not raised the price of its new dual microprocessor Power Mac over the previous single micro-processor Power Mac.

Even the analyst quoted by plaintiffs in their Complaint said that the relative shift in demand for Power Macs to lower speed and lower priced models was "unexpected." It is reasonable to infer, as did the district court, that defendants believed software developers would release additional products to make use of the dual micro-processor. Adobe had already created applications that could make use of the new dual micro-processor architecture. During the putative class period, Apple also began shipping early versions of Mac OS X, a new operating system that could take advantage of the dual micro-processor.

As Apple points out, exposing a company to securities fraud liability for failing accurately to predict demand for a radically new product would chill the innovation essential to the industry's growth. Indeed, the very nature of the computer business is one of constantly changing technology. It has not been that long since the idea of a personal computer was itself novel and few predicted how widespread computers would become nor how many applications there would be for their use.

Additionally, plaintiffs do not allege any factual statement that was false. With a dual micro-processor at the same price, that the new Power Mac was quite possibly the "best Power Mac ever" is an opinion, plausibly held. Further, when valuing a corporation, investors do not rely on such vague statements of optimism. *In re VeriFone Sec. Litig.*, 784 F.Supp. 1471, 1481 (N.D.Cal.1992), *aff'd*, 11 F.3d 865 (9th Cir.1993) ("[p]rofessional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives.").

We have held the following similar statements to be non-actionable puffery: "We're doing well and I think we have a great future"; "business will be good this year.... We expect the second half of fiscal 1992 to be stronger than the first half, and the latter part of the second half to be stronger than the first"; "Everything is clicking.... New products are coming in a wave, not a trickle.... Old products are doing very well"; and "I am optimistic about [the company's] performance during this decade." *Id.* at 1095 ("reasonable investors know [statements of optimism] do not guarantee future success"). *In re Syntex Corp. Sec. Litig.*, 855 F.Supp. 1086, 1095 (N.D.Cal.1994), *aff'd*, 95 F.3d 922 (9th Cir.1996). Just like these statements, Jobs' statements were opti-

mistic opinions, not guaranteed factual promises.

## 4Q00 Results

■ On September 28, 2000, Apple announced that its revenues for 4Q00 would be $1.87 billion, not the $2 billion it had projected. Nevertheless, Apple had a profitable fourth quarter: $0.30 earnings per share ("EPS"). Compared to 4Q99, the gross revenue was up 40%; the net 17.7%. Revenue increased from 3Q00. The law recognizes that "companies [should] be given leeway" when their forecasts are evaluated because "by their very nature, forecasts are imprecise." *Syntex*, 855 F.Supp. at 1096. We held that projections which are missed by 10% or less are not generally actionable. Indeed, we have held that a revenue estimate that was missed by approximately 10% was immaterial as a matter of law. *In re Convergent Tech. Sec. Litig.*, 948 F.2d 507, 514 (9th Cir.1991); *see also In re Silicon Graphics, Inc. Sec. Litig.*, 970 F.Supp. 746 (N.D.Cal. 1997), *aff'd*, 183 F.3d 970 (9th Cir.1999). Here, Apple missed its sales target by $130 million, or less than 10% of the revenue Anderson forecasted.

## Leave to Amend

■ Plaintiffs failed to proffer any new facts at the July 11, 2003 hearing on the motion to dismiss the Complaint. Instead, plaintiffs stated that they claimed their case was complete as presented in the Complaint, and that they would use leave to amend only to revise legal arguments and perhaps add a few unspecified "things" from Apple's website. Because plaintiffs failed adequately to proffer new allegations of facts, either at the hearing or in their brief on appeal, they failed either to allege or offer to allege scienter under the PSLRA; the dismissal with prejudice was warranted. *DSAM*, 288 F.3d at 391 (dismissal with prejudice prop-

er where plaintiffs "failed to come forward with additional facts that would meet the scienter pleading requirement"); *Vantive*, 283 F.3d at 1097–98 ("[P]laintiffs declined to say what additional facts they might plead if given the chance to amend. Such a failure is a strong indication that the plaintiffs have no additional facts to plead."); *Silicon Graphics*, 183 F.3d at 991.

## IV

Because plaintiffs failed to allege facts sufficient to raise a strong inference that any of the declarants knew their revenue and sales projections were false at the time they made those statements, or that the declarants were reckless with regard to the falsity of statements about current conditions at Apple, we affirm the district court's order dismissing the Complaint with prejudice.

**AFFIRMED.**