**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 17, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

# UNITED STATES COURT OF APPEALS

## TENH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

No. 07-1311

JOSEPH P. NACCHIO,

Defendant-Appellant.

## APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO (D.C. NO. 05-CR-00545-EWN)

Maureen E. Mahoney, Latham & Watkins LLP, Washington, D.C. (Alexandra A.E. Shapiro, J. Scott Ballenger, Nathan H. Seltzer, Latham & Watkins, Washington, D.C.; and Herbert J. Stern and Jeffrey Speiser, Stern & Kilcullen, Roseland, New Jersey, with her on the briefs), for Defendant-Appellant.

Stephan E. Oestreicher, Jr., U.S. Department of Justice, Criminal Division – Appellate Section, Washington, D.C. (Troy A. Eid, United States Attorney, and James O. Hearty and Kevin T. Traskos, Assistant United States Attorneys, District of Colorado; and Leo J. Wise, U.S. Department of Justice, Criminal Division – Fraud Section, with him on the brief), for Plaintiff-Appellee.

Andrew H. Schapiro, Mayer Brown LLP, New York, New York, and Evan P. Schultz, Mayer Brown LLP, Washington D.C.; Barbara E. Bergman, National Ass'n of Criminal Defense Lawyers, Albuquerque, New Mexico; David B. Smith, English & Smith, Alexandria, Virginia, for National Ass'n of Criminal Defense Lawyers as Amicus Curiae in support of Defendant-Appellant.

Daniel J. Popeo and Paul D. Kamenar, Washington Legal Foundation, Washington, D.C.; Andrew J. Levander, David S. Hoffner, Jason O. Billy and David P. Staubitz, Dechert LLP, New York, New York; and Michael L. Kichline,

Dechert LLP, Philadelphia, Pennsylvania, for Washington Legal Foundation as Amicus Curiae in support of Defendant-Appellant.

Before **KELLY**, **McCONNELL**, and **HOLMES**, Circuit Judges.

**McCONNELL**, Circuit Judge.

A Denver jury convicted Joseph Nacchio, the former CEO of Qwest Communications International, Inc., of nineteen counts of insider trading. Mr. Nacchio appeals, arguing that the evidence was insufficient to convict him, that the jury was improperly instructed, and that the trial judge incorrectly excluded evidence—expert testimony and classified information—important to his defense. We agree that the improper exclusion of his expert witness merits a new trial, but we conclude that the evidence before the district court was sufficient for the government to try him again without violating the Double Jeopardy Clause.

## I. BACKGROUND

### A. Qwest's Revenue Projections

In July 2000, Qwest completed a merger with U.S. West, another (larger) telecommunications company. Mr. Nacchio told employees upon completion of the merger that "the five-year business plan is . . . grow, die, or sell." Aplee.'s Supp. App., exh. 514A. In September 2000, he laid out new revenue, earnings, and growth targets for Qwest's next year. He announced a public prediction, or "guidance," of $21.3 to $21.7 billion in expected revenue in 2001. Qwest also

prepared a separate set of internal revenue targets, higher than the public guidance. Internal targets were typically set higher than public targets to encourage employees to exceed public targets. In addition, performance bonuses were paid to employees who met or exceeded internal targets. During most of the time relevant to this litigation, the 2001 year-end internal target was $21.8 billion, which was $500 million more than the bottom of the public guidance.

At the time, some Qwest employees expressed concern that the guidance and targets were too high. That September, for example, Robin Szeliga, Qwest's vice-president of financial planning, received a memo from two financial analysts who worked for her. The memo, called a "risk estimate," forecast problems with Qwest's revenue guidance. Ms. Szeliga shared the contents of the memo with Qwest's Chief Financial Officer, Robert Woodruff, and later with Mr. Nacchio. The memo suggested that Qwest could make as little as $20.4 billion, a shortfall of $900 million from its public target.

One particular problem was that Qwest had traditionally relied on revenues from long-term leases, known as indefeasible rights of use (IRUs), to use space on Qwest's fiber optic network. Because Qwest collected money for the entire lease up front, IRU sales generated one-time revenue rather than a stream of recurring income. Therefore, to meet its 2001 public target, Qwest executives determined that Qwest had to make an "aggressive pivot" or "shift" from its reliance on the sale of IRUs to recurring revenue streams, such as standard

consumer phone service. App. 2177, 2600. In fact, even though Qwest had a poor track record in growing recurring revenue, the 2001 budget required Qwest to double its 2000 growth rate for recurring revenue.

As early as December 2000, Qwest executives told Mr. Nacchio that this shift from IRUs to recurring revenue had to occur by April 2001 and he agreed. If Qwest failed to sign up enough new customers early in the year, it would not later benefit from sufficient compounding to close its third and fourth quarter budget gaps and would be forced to revise its public guidance downward.[1] Mr. Nacchio understood that a slow start in obtaining new recurring revenue would have a "snowball effect" which would doom Qwest's year-end target for 2001. App. 2494. In January 2001, Mr. Nacchio acknowledged the importance of this when he told his sales staff that "something big" had to happen "by April" and that the first half of 2001 was "absolutely critical." App. 2178; Aplee.'s Supp. App. exh. 551A, 559B. Although Qwest insiders clearly appreciated the risk inherent in the public guidance, it was not Qwest's policy to disclose the portion of its income attributable to IRU sales, and thus the public was unaware of the degree of this risk.

---

[1] Recurring revenue that begins early in the year increases annual earnings more than recurring revenue that begins later. For example, subscribers who begin service in January pay for 12 months of service while those who begin in December only pay for 1 month.

Qwest's revenues met internal targets during the first two quarters of 2001, largely due to IRU sales. However, there was ominous news. In early April, Mr. Nacchio had conversations with Greg Casey, Qwest's executive vice-president of wholesale markets, about the company's sales of domestic IRUs. Mr. Casey told him:

> [T]he IRU market was drying up, that after the second quarter—in the second quarter, we felt like we were draining the pond in terms of the IRU deals that were out there, and that we couldn't rely on IRUs—I couldn't see—have any visibility to what IRUs would be doing after the second quarter.

App. 2496.

> Similarly, Ms. Szeliga testified that on April 9:

> [T]he plans that we had at this point to cover estimated gaps were IRUs, and we had spoken with Mr. Nacchio . . . about the fact that the IRU market was worsening, in other words, there wasn't as much demand for this product. So . . . the plan was very risky if we were just going to rely on IRUs.

App. 2210–11. Mr. Nacchio also learned on April 9 that recurring revenue was off by 19%, indicating that the company was well short of increasing its recurring revenue in time to reduce its third and fourth quarter budget gaps. At the same time, however, Mr. Nacchio was told at a company meeting that even "with all of the debates . . . the internal current view of Qwest was that they would reach $21.5 billion by December 31st, 2001," still meeting the public projections. App. 2323.

On April 24, Qwest announced its first quarter earnings in a press release, and Mr. Nacchio conducted a conference call to investors. In that call, Mr. Nacchio announced that the company was "still confirming" its previous guidance regarding long-term growth. App. 1598. He did not break down Qwest's earnings into IRUs and recurring revenue. Later that day, Mr. Nacchio met with investors in Los Angeles, who pointed out that other telecommunications companies had lowered their guidance. One of them asked Mr. Nacchio how Qwest was going to meet its growth targets, saying "now was the time for [Qwest] to take [its] numbers to believability." App. 1599. Mr. Nacchio responded that Qwest had better products and better management, and stressed its strong revenue growth in the category of "data and IP." App. 1605. One-time transactions made up a portion of this revenue, but Mr. Nacchio did not mention this. Lee Wolfe, Qwest's vice-president of investor relations, testified that investors asked, "[m]any times," for "the makeup of data and IP," but that Mr. Nacchio refused to tell them. App. 1600. In fact, as analysts and investors repeatedly requested a breakdown of Qwest's revenue during the first quarter of 2001, insiders such as Mark Schumacher, the company's controller, advocated disclosing the information. However, Mr. Nacchio, who retained the final say over Qwest's public disclosures, declined to do so.

**B. The Defendant's Stock Sales**

At approximately the time Mr. Nacchio was receiving these internal reports regarding IRU sales and recurring revenue and assuring investors that the company was on track to meet its public guidance, he was selling over a million shares of Qwest stock. This occurred a few months before the company was forced to lower its guidance by a billion dollars, the amount previously estimated by Qwest's financial officers, and the stock lost half its value. These sales are the basis of the government's charge that Mr. Nacchio was trading on inside information. Mr. Nacchio claims, however, that a full understanding of the context of his sales proves otherwise.

Like many highly-paid CEOs at the time, Mr. Nacchio received a substantial portion of his compensation in stock options rather than in cash. Options are a common part of CEO salaries because they provide incentives to perform. Option compensation also provides cash-flow advantages to the company, because a company expends no cash when it grants them, and, at one time, a company did not need to account for the cost until the option was exercised. *See* Share-Based Payment, Statement of Fin. Accounting Standards No. 123 (Fin. Accounting Standards Bd. 2004); Kevin J. Murphy, *Explaining Executive Compensation: Managerial Power versus the Perceived Cost of Stock Options*, 69 U. Chi. L. Rev. 847, 859–60 (2002); Fischer Black & Myron Scholes, *The Pricing of Options and Corporate Liabilities*, 81 J. Pol. Econ. 637 (1973).

Among Mr. Nacchio's holdings as of October 2000 were options for $7.4 million in Qwest stock, with an expiration date of June 2003.

One way that a corporate official can dispose of stock without liability for insider trading is to do so pursuant to a fixed sales plan. Under SEC rules, if a person has no material inside information when he "[a]dopt[s] a written plan for trading securities," and that plan sets fixed rules for when he will buy and sell shares in the future, then his trades are not "on the basis of" inside information even if he later does acquire inside information. 17 C.F.R. § 240.10b5-1(c). Qwest's general counsel, Drake Tempest, was required to approve each stock sales plan entered into by each Qwest officer; doing so required a determination that the officer was not in possession of material nonpublic information at the time he entered into the plan. Except for sales according to a fixed sales plan, Qwest policy only permitted officers to sell stock during short "trading windows" each quarter immediately after quarterly earnings were announced. App. 1879.

In October 2000, Mr. Nacchio announced that he would exercise options and sell approximately one million shares each quarter. This would enable him to exercise his $7.4 million in options before their expiration date, while spreading his sales out over time to avoid the risk of a stock drop that comes when too many shares are sold at once. Mr. Nacchio did not actually enter into a formal trading plan in October, but he did so—briefly—in February 2001, which was approved by Tempest. He cancelled the plan less than a month later, when Qwest's stock

fell below $38 per share. At that time, he stated, "I would expect to return to my prior practice of making sales in quarterly trading windows, or, in, appropriate circumstances consider entering into a new daily sales program if I believe the stock price is more realistic." App. 4803. He now points to this decision as evidence that, rather than having knowledge of an impending revenue shortfall with attendant decline in stock price, he believed the stock price would remain above $38.

The second-quarter trading window began on April 26, 2001, with Qwest's stock at $39 per share. Between then and May 15, Nacchio sold 1,255,000 shares of Qwest as the share price hovered between $37 and $42. His rate of sales in those weeks was about four times his average rate from 1998 to 2000, but only slightly more than the million shares per quarter he had declared his intention to sell in his October 2000 announcement. At the end of the May trading window, Mr. Nacchio entered into a second automatic sales plan, approved by Tempest, to sell 10,000 shares a day as long as the stock price was at least $38 per share.

On May 29, 2001, Qwest's stock price dropped below $38, where it has remained since. Mr. Nacchio sold no more shares after that, and finished the year with more vested options than he had owned at the beginning. He made no attempt to sell any of the Qwest stock (other than options) he held in his personal account, nor that owned by his family.

### C. The Collapse of Qwest Stock

During the next few months, the internal warnings regarding overreliance on a dwindling pool of IRU sales were increasingly confirmed. On August 15, Qwest disclosed its IRU sales in a filing with the SEC. App. 1672. The immediate effect on Qwest's stock price was negligible, but it had been in decline both before and after. Lee Wolfe testified that "there had been . . . some disclosure after the first quarter," that some of Qwest's revenue was one-time rather than recurring, "[b]ut they were not—the magnitude was not known," until August. App. 1673. On September 10, 2001, Mr. Nacchio lowered Qwest's public guidance by one billion dollars. Mr. Wolfe testified that Mr. Nacchio and Drake Tempest had sought to put enough time between the disclosure regarding reliance on IRU sales and the change in guidance that it would not seem as if Mr. Nacchio had been concealing information. By September 21, Qwest's stock had fallen 60% from its January level. During the same period, the Dow Jones Industrial Average dropped approximately 24% and the NASDAQ composite index dropped 46%.[2]

**D. Prosecution and Trial**

In December 2003, Mr. Nacchio was indicted and charged with 42 counts of insider trading. The government alleged that Mr. Nacchio's sales from January to May 2001 were on the basis of inside information, because he had material

---

[2] *See* http://money.cnn.com/quote/historical/historical.html?symb=INDU; http://money.cnn.com/quote/historical/historical.html?symb=COMP.

nonpublic information about Qwest—specifically that the company was relying heavily on IRU sales, a non-recurring source of revenue to meet its first and second quarter public guidance, and that the company had not made the needed shift to recurring revenue which placed the company at substantial risk of not meeting its year-end guidance. After a sixteen-day jury trial, the jury deliberated for six days and convicted Mr. Nacchio on the nineteen counts of insider trading covering his trades in April and May 2001. It acquitted him of the counts covering the trades from January to March. The district court then sentenced Mr. Nacchio to six years' imprisonment on each count, to run concurrently, two years' supervised release on each count, to run concurrently, fined him $19 million, and ordered him to forfeit over $52 million more. Challenging his conviction, his sentence, and the forfeiture, Mr. Nacchio appeals to this Court.

We reverse his conviction and remand the case for a new trial. In Section II, we discuss the evidence that Mr. Nacchio was prevented from using at trial, and explain why the district court's error entitles him to a new trial. We cannot stop there, however, because the government is entitled to try the defendant a second time only if its evidence at the first trial was legally sufficient. In Section III, therefore, we explain the government's theory of the case and discuss the sufficiency of the evidence in light of the jury instructions, concluding that a properly-instructed jury could have found the Defendant guilty of insider trading. Finally, in Section IV we discuss the nature of the remand.

## II. EVIDENTIARY ISSUES

The defense strategy relied heavily on the proposed testimony of an expert witness, Professor Daniel Fischel, and classified information relevant to Qwest's business prospects and the defendant's state of mind. The district court excluded both, and on appeal the defendant asserts that these decisions are reversible error. We agree that the district court's exclusion of Professor Fischel's testimony was an error that requires a new trial. There was no error in excluding the classified information.

### A. Expert Testimony

The Federal Rules of Criminal Procedure require a defendant under certain circumstances to provide to the government, upon request, "a written summary of any testimony that the defendant intends to use [at trial] under Rules 702, 703, or 705 of the Federal Rules of Evidence." Fed. R. Crim. P. 16(b)(1)(C). This includes expert testimony. "The summary must describe the witness's opinions, the bases and reasons for these opinions, and the witness's qualifications." *Id.* The parties do not dispute that Rule 16 disclosure was required in this case.

On March 16, 2007, the defense disclosed its intention to call Professor Daniel Fischel to provide economic analysis of Mr. Nacchio's trading patterns, and to testify about the economic importance of the allegedly material inside information. The government objected that this notice was insufficient under Rule 16. The district court agreed, holding that the notice was in "plain violation

of the Rules," because the defense had "offer[ed] no bases or reasons whatsoever for Professor Fischel's opinions contained in the summary." App. 352. The judge instructed the defense to file a revised disclosure, "bringing his submission into compliance with Rule 16," by March 26. *Id.*

In court on March 22, in the course of granting the defense three extra days to prepare a revised disclosure, the district judge commented that he was "flabbergasted, frankly, that [the defense] could think th[e first disclosure] was an adequate expert disclosure," and said: "I think [Rule 16] is pretty clear, and . . . it's pretty close to what is required in the civil area." App. 2038, 2041. The government's lawyer then added, "[I]t's my concern at least based on the way the disclosure is raised [sic] right now, there could be Daubert issues that arise with respect to certain parts of the testimony." *Id.* at 2041–42. "*Daubert*" is legal shorthand for the district court's obligation to test a proposed expert's methodology in advance of his testimony.[3] Defense counsel responded: "In Latin, forewarned is forearmed." *Id.* The court then recessed.

On March 29, the defendant filed a revised, ten-page Rule 16 disclosure describing Professor Fischel's qualifications as an academic, his research and teaching in law and finance, and his previous experience consulting and

---

[3] *See Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993) (requiring expert testimony to be pursuant to a reliable methodology). As the district judge noted, *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), may actually be the governing case. The parties used "*Daubert*" as shorthand for these doctrines and so will we.

testifying. It gave a "Summary of Opinions and Bases for Opinions," explained that Fischel had conducted a "study of the Questioned Sales in relation to various benchmarks," and provided his consequent opinion that Mr. Nacchio's sales were inconsistent with what one would expect them to be if the government's claims were true. App. 427–30. It recounted that Professor Fischel had studied stock data and assorted public information and stock analysis and had concluded that Qwest's stock price was not significantly affected when the allegedly material information was released.

On April 3, the government filed a 63-page motion to exclude Professor Fischel's testimony. The government's main argument was that the Rule 16 disclosure was still inadequate. It also argued, however, that "[e]ven if the Court determines that the disclosure was adequate, the Court should rule that Defendant has not established its admissibility" under, among other things, *Daubert*. App. 420. The next day, April 4, the defendant filed a seven-page response. He argued that the disclosure was adequate for Rule 16 purposes, that Professor Fischel's opinions would "assist the trier of fact," as Rule 702 requires, and that Professor Fischel's qualifications in "the economics of financial markets" were adequate. App. 466, 468. The response made no mention of Professor Fischel's methodology, or of *Daubert*.

The next day, April 5, trial resumed and the defense called Daniel Fischel to the stand. Without either party saying anything, the judge interjected, "All

right. Members of the jury, I need to make some legal rulings at this time," and dismissed the jury. App. 3913. Without hearing from counsel for either party, the judge then ruled that Professor Fischel's expert testimony was inadmissible, explaining himself at length. The judge said that "the deficiencies under Daubert and Kumho Tire in these disclosures are so egregious that they hardly warrant the 63 pages of ink the Government has spilled in opposing the testimony." App. 3914. The judge noted that Professor Fischel's "methodology [was] absolutely undisclosed in this expert disclosure." App. 3917. After criticizing the Rule 16 disclosure's failure to address methodology, the Court also separately concluded that the testimony would not be helpful to the jury under Federal Rule of Evidence 403 or 702, because expert economic analysis would "invit[e] the jurors to abandon their own common sense and common experience and succumb to this expert's credentials," App. 3920, and concluded that "the bulk of [Fischel's] testimony is simply a recitation of facts which is improper under Rule 602." *Id.* He then asked the defense to call a new witness. After the judge's ruling, the defense spoke for the first time since attempting to call Professor Fischel:

MR. SPEISER: Your Honor, may I be heard?

THE COURT: No. You know, in this court, we follow, the rule, generally, that we have argument and ruling. Not, the Court rules, and then it's an interactive process where you get to argue later on. I have your motion, I have the Government's motion, I have your response. Any argument that you wish to make could have been put in the response.

MR. SPEISER: We were under tremendous time pressure.

THE COURT: So what? You could have put it in the response. You have made your record. You have made your argument. I've ruled. This habit that the defense has of questioning every ruling by argument later on is not going to be tolerated in this court.

App. 3921. The government had not spoken at all. The defense then called Professor Fischel as a non-expert witness. He was permitted to give summary testimony about the facts of Mr. Nacchio's trades, without any economic analysis.

We conclude that on the record before him the district judge was wrong to prevent Professor Fischel from providing expert analysis, and that this error was not harmless.

### 1. Rule 16

The defendant's disclosures did not have the "egregious" "deficiencies" that the district court described. App. 3914. Rule 16 requires a defendant wishing to call an expert witness to disclose, in some circumstances, "the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." Fed. R. Crim. P. 16(b)(1)(C)(i). The district court's belief that Rule 16 also requires extensive discussion of a witness's *methodology* was incorrect, and its exclusion of the evidence an abuse of discretion.[4]

---

[4] At oral argument, the defendant appeared to argue that the Rule 16 disclosure did substantially discuss Professor Fischel's methodology. We agree with the district court's conclusion that it did not.

Rule 16 is designed to give opposing counsel notice that expert testimony will be presented, permitting "more complete pretrial preparation" by the opposing side, Fed. R. Crim. P. 16, 1993 Advisory Comm.'s Notes, such as lining up an opposing expert, preparing for cross-examination, or challenging admissibility on *Daubert* or other grounds. Rule 16 disclosure is not designed to allow the district court to move immediately to a *Daubert* determination without briefs, a hearing, or other appropriate means of testing the proposed expert's methodology. *See* Margaret A. Berger, *Procedural Paradigms for Applying the* Daubert *Test*, 78 Minn. L. Rev. 1345, 1360 (1994)("Although the summary required by Rule 16 provides the defense with some notice, the requirement of setting forth 'the bases and reasons for' the witnesses' opinions does not track the methodological factors set forth by the *Daubert* Court."). Indeed, a Rule 16 disclosure need not be filed with the court,[5] but only with opposing counsel, which makes clear that it is not intended to serve as the basis for a judicial determination regarding admissibility. It also bears mention that a defendant is not required to file a Rule 16 disclosure unless the defendant has made a similar request of the government under Rule 16(a)(1)(G) and the government has

---

[5] Rule 16 requires only that the written summary be given "to the government," Fed. R. Crim. P. 16(b)(1)(C), and criminal discovery can generally "proceed without the district court's intervention" unless there is a dispute. *United States v. Mentz*, 840 F.2d 315, 328 (6th Cir. 1988). The defendant's disclosure in this case was not filed with the court, but was attached to the government's subsequent motion to exclude the testimony.

complied.  Obviously, this scenario does not preclude the government from challenging the defendant's proffered expert under *Daubert*.  It is therefore a mistake to regard the Rule 16 disclosure as a substitute for a *Daubert* hearing.

The defendant's disclosure did exactly what the law required.  Rule 16 requires, first, disclosure of "the witness's opinions."  Fed. R. Crim. P. 16(b)(1)(C)(i).  The government does not contest that the disclosure listed Professor Fischel's opinions on several topics, including whether Mr. Nacchio's trading pattern was suspicious, how Qwest stock prices related to the September 2000 guidance, and the magnitude and importance of the information Qwest had about its IRU revenue.  Rule 16 requires next "the bases and reasons for those opinions."  *Id.*  The disclosure explained that the opinion was "based on" analysis of Mr. Nacchio's trades, data on stock prices, executive options, and stock sales; as well as on analysis of press reports, analysts' reports and forecasts, and SEC filings.  It also contained the reasons for Professor Fischel's ultimate opinions. For example, he would have testified that principles of risk reduction and the pattern of Mr. Nacchio's sales were inconsistent with reliance on adverse material inside information, and that the September 2000 guidance was not misleading because Qwest's stock price fell after it was announced but not when that guidance was reduced in September 2001.  Finally, Rule 16 requires disclosure of "the witness's qualifications."  The defense disclosed Professor Fischel's work at Lexecon (a law-and-economics consulting firm), his academic positions, his

academic research, his previous experience as an economic consultant and adviser, and his 25-page curriculum vitae. On multiple occasions, Professor Fischel had testified as an expert witness for the Department of Justice in finance cases.

We do not doubt that, in response to a Rule 16 disclosure statement, the district court could order a party to make a written proffer in support of admissibility under Rule 702. *See United States v. Rodriguez-Felix*, 450 F.3d 1117, 1122 (10th Cir. 2006); *United States v. Rodriguez-Felix*, No. 04-CR-665 (D. N.M. filed Mar. 25, 2004), docket no. 76; *United States v. Sourlis*, 953 F. Supp. 568, 581 (D. N.J. 1996). It does not much matter whether such additional detail is regarded as part of the Rule 16 "duty" to disclose, *see Sourlis*, 953 F. Supp. at 581, or as an exercise of the court's discretion in "deciding . . . what procedures to utilize in making" the Rule 702 determination, as our precedent implies, *Rodriguez-Felix*, 450 F.3d at 1122. We have found no case—and the government has cited none—where a defendant's proffered expert was excluded under *Daubert* solely on the basis of a Rule 16 deficiency, without any further opportunity of briefing or hearing.

The district court's error may have proceeded from confusion between the civil and criminal rules. Unlike under the civil rules, an expert in a criminal case is *not* required to present and disclose an expert report in advance of testimony. A Rule 16 disclosure must contain only "a written summary of any testimony"

-19-

and "describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." Fed. R. Crim. P. 16(b)(1)(C). In contrast, an expert's written report in a civil case must include not only "a complete statement of all opinions the witness will express and the basis and reasons for them," Fed. R. Civ. P. 26(a)(2)(B)(i), and his qualifications, R. 26(a)(2)(B)(iv), but also all of the data or other information considered in forming the opinion, all summary or supporting exhibits, and the compensation he was paid. *Id.* R. 26(a)(2)(B)(ii)–(iii), (vi). Thus, the judge's comment that the criminal expert disclosure requirement is "pretty close to what is required in the civil area," App. 2041, was not correct—one need only look at the text of the two rules to recognize the broader requirements of the civil rule. *See United States v. Mehta*, 236 F. Supp. 2d 150, 155–56 (D. Mass. 2002) (Gertner, J.) ("One way to decipher the meaning of the criminal expert discovery rules is to compare them to the civil discovery rules, which are much broader. While Fed. R. Civ. P. 26(a)(2) requires a 'complete statement' of the expert's opinion, the criminal rule requires only a 'summary of testimony.' Civil Rule 26(a)(2) additionally requires the disclosure of: 'all opinions to be expressed and the basis and reasons therefor' . . . . ").

The government argues that a Rule 16 disclosure should include sufficient information to meet the proponent's burden under *Daubert* because the goal of Rule 16 is "'to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination,'" Aplee's Br. 54

-20-

(quoting Fed. R. Crim. P. 16, 1993 Advisory Comm.'s Notes) and "[t]he prosecution could hardly test an undisclosed methodology." *Id.* at 55. However, it is not true that the prosecution had no way to test Fischel's methodology if it did not appear in a Rule 16 disclosure, just as it could have tested his methodology if there had been no disclosure at all (as Rule 16 contemplates in some cases). The prosecution had every right to demand a *Daubert* hearing to test his methodology. The court also may have had discretion to order a *Daubert* proffer in advance of any such hearing. Other courts have sometimes relied on this purpose of the rule to excuse disclosing *less* than Rule 16 requires. *E.g.*, *United States v. Cuellar*, 478 F.3d 282, 294 (5th Cir. 2007) ("Although the notice provided by the government did not contain all the detail required by the rule . . . [t]he purposes of Rule 16 were not frustrated."), *cert. granted on other grounds*, 128 S. Ct. 436 (2007). We have found no case requiring *more*. The defense complied with Rule 16, and that gave the government all the "fair opportunity" for cross-examination that the rule contemplates.

### 2. *Daubert*

Even if there was no Rule 16 violation, the government contends, the district court properly excluded the testimony under *Daubert* and Rule 702. We cannot agree.

Most importantly, the district court made no genuine determination of any sort under *Daubert*. The most straightforward reading of the transcript is that the

judge excluded the evidence on Rule 16 grounds alone. It was "the deficiencies under Daubert and Kumho Tire *in these disclosures*" that the district court found "egregious." App. 3914 (emphasis added). At the conclusion of its discussion of *Daubert*, the court repeated that it was "concerned . . . with the methodology, which is absolutely undisclosed *in this expert disclosure*." App. 3917 (emphasis added). It is true that the court repeatedly discussed what *Daubert* requires of an expert, but only in explaining what was missing from the Rule 16 disclosures. As we have discussed, a Rule 16 disclosure need not provide a full explanation of the witness's methodology, so it is wrong to demand that such a disclosure satisfy *Daubert*.

Even reading the district court's ruling as a freestanding *Daubert* ruling rather than a finding that the Rule 16 disclosure was inadequate,[6] such a ruling would have been an abuse of discretion on this record, which is devoid of any factual basis on which a *Daubert* ruling could be made. In a criminal trial the proponent of expert testimony is not under any obligation to provide a "a complete statement" of the reasons for the expert's opinion, *compare* Fed. R. Civ. P. 26(a)(2)(B)(i), or an explanation of the expert's methodology. In the absence

_____

[6] *See Sprint/United Management Co. v. Mendelsohn*, 552 U.S. ___, No. 06-1221, 2008 WL 495370, at *5 (Feb. 26, 2008) ("An appellate court should not presume that a district court intended an incorrect legal result when the order is equally susceptible of a correct reading."). We do not believe the district court's ruling is "equally susceptible" to the alternative reading, but we do not entirely rule it out.

of a court ruling that the *Daubert* issue be addressed and resolved in some other way, the first order of business upon presenting the expert in court would be to establish his qualifications and the admissibility of his testimony, either through written submissions or by asking the necessary questions and allowing the other side to cross-examine or introduce evidence challenging the basis for his testimony. This could take place outside the presence of the jury. The district court could not make an informed *Daubert* determination without hearing such testimony or receiving submissions on the issue in some other form.

When district judges *admit* testimony under *Daubert* we require them to make "specific findings on the record" rather than rule "off-the-cuff." *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1223 (10th Cir. 2003) (quoting *Goebel v. Denver & Rio Grande W.R.R.*, 215 F.3d 1083, 1088 (10th Cir. 2000)) (internal quotation marks and emphasis omitted). We also require the court to create "a sufficiently developed record in order to allow a determination [on appeal] of whether the district court properly applied the relevant law." *Goebel*, 215 F.3d at 1088 (quoting *United States v. Nichols*, 169 F.3d 1255, 1262 (10th Cir. 1999)) (internal quotation marks and further citation omitted). Although "rejection of expert testimony is the exception rather than the rule," Fed. R. Evid. 702, 2000 Advisory Comm.'s Notes, we have not had occasion to decide whether the same procedural requirements apply before a judge excludes an expert. We need not resolve that issue here, because we conclude that at a minimum it is an abuse of discretion to

exclude an expert witness because his methodology is unreliable without allowing the proponent to present *any* evidence of what the methodology would be. The proponent bears the burden of establishing the admissibility of the evidence under Rule 702, but it must be given an opportunity to do so before the testimony may be ruled inadmissible.

Finally, the government argues that we should affirm Professor Fischel's exclusion because the defense failed to respond to the *Daubert* issue in its April 4 response, and thus waived the right to do so. We do not agree. The defense had only one day to respond to the government's 63-page motion, and did not have clear notice that it had to present its *Daubert* defense at that time. The judge's ruling on the first Rule 16 disclosure, which set the exchange of motions and replies going, mentioned "Federal Rules of Evidence 401, 403, 602, 702, and 704," but held that "[t]he matter may be settled through analysis under Rule 16." It made no mention of *Daubert*. The defendant complied by providing an analysis under Rule 16. App. 351. Only then did the government file its lengthy motion, which combined an argument that Rule 16 requires disclosure of methodology with an attack on the witness's methodology under *Daubert*. The defendant may reasonably have interpreted the references to *Daubert* as arguments about Rule 16, as a request for a *Daubert* hearing, or perhaps as notice that the government intended to move for such a hearing. The defendant had no reason to think that the *Daubert* issue would be resolved on the basis of memoranda of law addressed

-24-

to the Rule 16 issue, which is not the usual procedure. We give district judges "broad discretion . . . in deciding . . . what procedures to utilize" to assess reliability, *Dodge*, 328 F.3d at 1223, but it is for this reason that parties cannot be held to guess the procedural rules in advance. Courts should not punish parties for guessing wrong, especially with the extreme sanction of excluding evidence central to the defense.

Finally, the defense was never permitted to speak to the issue in court. When Professor Fischel was called, the district judge immediately announced that he was excluding the testimony. A defense lawyer asked to speak. The judge silenced him immediately, saying that once the court had ruled, the trial was "[n]ot . . . an interactive process where you get to argue later on." App. 3921. When the court does not allow a lawyer to present arguments, we will not penalize him for failing to present them.

A judge does not necessarily have to let lawyers "argue later on," but he has to let them argue *sometime*. Our decision in *United States v. Rodriguez-Felix*, 450 F.3d 1117 (10th Cir. 2006), illustrates the point. In *Rodriguez-Felix*, the defendant wished to call an expert to testify about the reliability of eyewitness testimony. Because the Rule 16 notice (naturally) did not disclose the expert's methodology, the district court scheduled a *Daubert* hearing, and also ordered the defendant to submit a specific proffer on the *Daubert* issue. *United States v. Rodriguez-Felix*, No. 04-CR-665 (D. N.M. filed Mar. 25, 2004), docket nos. 75,

When the expert did not attend the hearing, the district court then considered the *Daubert* proffer alone, and excluded the testimony because the proffer was insufficient. *See Rodriguez-Felix*, 450 F.3d at 1125–27. In Mr. Nacchio's case, the defense was given no similar opportunity to present evidence.

As the judge explained later that morning, the trial was on track to finish "way ahead of time." App. 3942. The jury was out of the room. Indeed, the jury was soon dismissed for the rest of the day because the surprising exclusion of Professor Fischel threw the parties' lawyers into disarray. The judge could have put Professor Fischel on the stand to ask him about his methodology, allowed the government to do so, asked Mr. Nacchio's lawyers if they would like to address the issue for the first time, or even simply let them speak to see if they had a meritorious objection. Having permitted none of those things, however, it would have been an abuse of discretion to make a *Daubert* finding of unreliability.

### 3. Rules 403 and 602

While the district judge excluded Professor Fischel "primarily [for] the gross defect" in the Rule 16 disclosure, App. 3921, he also excluded the expert testimony because he thought it would not be helpful to the jury, was more prejudicial than probative, and consisted of impermissible facts rather than opinions. *See* Fed. R. Evid. 403, 602, 702. We reverse these alternative conclusions as well.

Professor Fischel's testimony was to include a discussion of the economic incentives that inside information would have given Mr. Nacchio, the statistical significance of the differences in his trading patterns, and the likelihood that economic diversification better explained the challenged sales than inside information. The judge concluded that all of these things were "within the common knowledge of the jury" and that "[t]he jury simply d[id]n't need this so-called expert witness to testify that diversification is an issue in this case." App. 3918–19. This misunderstands the nature of economic expertise. An economic expert is permitted not only to tell the jury that an economic concept "is an issue" but to analyze the concept and offer informed opinions. In other words, expert testimony may "assist the trier of fact to understand the facts already in the record, even if all it does is put those facts in context." 4 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 702.03[1] (2d ed. 2006) (footnote omitted). That is why expert economic testimony is routine when a materiality determination requires the jury to decide the effect of information on the market. *See, e.g.,* 3 Alan R. Bromberg & Lewis D. Lowenfels, *Bromberg and Lowenfels on Securities Fraud & Commodities Fraud* § 6:153 (2d ed. 2007). While economic analysis sometimes asks jurors to "abandon their own common sense," App. 3920, that is not a reason to deem expert testimony inadmissible. Armchair economics is not the way to decide complex securities cases.

The district court's holding that the testimony was inadmissible under Rule 403 suffers from the same problem. The court's analysis on the point was very brief, and mostly dependent on the conclusions we have already rejected.

Finally, the district court was wrong to conclude that it was "perfectly obvious" that Professor Fischel did not have personal knowledge of the facts that formed the basis for his opinions. App. 3921. The judge said that Professor Fischel did not have personal knowledge of Qwest's stock price, of the contents of analysts' reports, or of the guidance issued by other telecommunications companies. But Professor Fischel's expert disclosure—which is all the court consulted—said that he and his staff "ha[d] reviewed" Qwest's stock prices, the analysts' reports, and so on. App. 433. This is personal knowledge; it is not clear what more the district judge demanded. In *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114 (10th Cir. 2005), we held that Rule 602 permitted a lay witness to testify about the contents of a list of audit reports. As we explained, "[s]ince [the witness] personally examined these audit reports, she had personal knowledge of their content." *Id.* at 1123. Apart from potential hearsay objections, Professor Fischel would have been perfectly entitled to testify about facts in the reports, even as a lay witness.

Moreover, we have also held that "[t]he standards [of personal knowledge] applied to lay and expert witnesses differ." *Durflinger v. Artiles*, 727 F.2d 888, 892 (10th Cir. 1984). In particular, Rule 703 "permits an expert to base an

-28-

opinion on any facts or data, *admissible or not*, which are of a type reasonably relied on by experts in the particular field . . . ." *Id.* (emphasis added) (internal quotation marks and citation omitted). Because using stock prices and information issued by various companies is a common and reasonable way for an economist to analyze the impact of that information on the stock prices, there was no basis for excluding his testimony about stock price.

### 4. Prejudice

The government contends that even if the exclusion of Professor Fischel was error, it was harmless. We disagree.

The right of a defendant to call witnesses is crucial for testing the prosecution's case and defeating the charges against him. Indeed, the "right to present a defense . . . is a fundamental element of due process of law." *Washington v. Texas*, 388 U.S. 14, 19 (1967). Even if the exclusion does not rise to the level of a constitutional violation, the burden is on the government to prove that the error did not have "a 'substantial influence' on the outcome." *United States v. Rivera*, 900 F.2d 1462, 1469 (10th Cir. 1990) (en banc) (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)).

We are persuaded that the exclusion of Professor Fischel was not inconsequential under any standard. The theory of Mr. Nacchio's defense was that the stock price was not affected by his disclosures, that his conduct had an innocent explanation, and that a reasonable investor would not have found his

inside information very important. Professor Fischel's testimony, as described in the disclosure, could have addressed each of these issues, and if credited by the jury, might have changed the jury's mind. The record does not otherwise contain "overwhelming evidence of guilt," *United States v. Montelongo*, 420 F.3d 1169, 1176 (10th Cir. 2005), and so we cannot say the exclusion was harmless.

**B. Classified Information**

Mr. Nacchio also argues that the district court was wrong to prevent him from presenting certain classified information as evidence at trial. He claims that the evidence would have shown that he personally had reason to believe that Qwest's economic prospects were much better than others realized. Thus, he says, this evidence should have been permitted both to show that he did not have material information and to negate scienter. We affirm the district court's decision, because even if the classified information were presented and established what he said it would, it could not exonerate Mr. Nacchio as he claims.

Essentially, Mr. Nacchio argues that undisclosed positive information can be used as a defense to a charge of trading on undisclosed negative information. We disagree. If an insider has material information that he cannot disclose because it is confidential or proprietary, then he must abstain from trading. That is the lesson of *In re Cady, Roberts & Co.*, Exchange Act Release No. 6,668, 40 S.E.C. 907, 911 (1961), later applied in *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d

833, 848, 850 n.12 (2d Cir. 1968), and *Chiarella v. United States*, 445 U.S. 222, 226–29 (1980). It is black-letter law that insiders must disclose their material information or else abstain.

It is true that in cases like *Texas Gulf Sulphur*, insiders were trading in bullish positions ahead of the disclosure of the company's proprietary discovery, and thus their trading correlated with the inside information, while here Mr. Nacchio argues that his possession of classified information neutralizes his possession of other inside information. However, the general rule applies. If an insider trades on the basis of his perception of the net effect of two bits of material undisclosed information, he has violated the law in two respects, not none.

### III. SUFFICIENCY OF THE EVIDENCE

Although we have concluded that Mr. Nacchio's conviction must be reversed on account of trial error, we cannot leave it at that. He also claims that the government failed to introduce evidence sufficient for him to be convicted. If he is right, he was entitled to a judgment of acquittal and cannot be retried without violating the Double Jeopardy Clause. *See Anderson v. Mullin*, 327 F.3d 1148, 1155 (10th Cir. 2007). An analysis of sufficiency of the evidence is not merely a technical matter, but can require resolution of important questions regarding the elements of the offense. Under one interpretation of a penal statute the evidence may be sufficient, while under a different interpretation it may fall

short. We must therefore examine the government's theory of the case and determine what is needed to support a conviction for insider trading in this context.

Mr. Nacchio also challenges certain of the jury instructions, which presented the government's theory of the case to the jury and framed its considerations of the evidence. If he is right regarding those challenges, and if the error is not harmless, this would constitute an additional ground for reversal, though it would not preclude retrial. But if the evidence introduced at trial is insufficient to support conviction under a correct theory of the case, he is entitled to a judgment of acquittal. The jury instructions question and the sufficiency-of-the-evidence question are interrelated: when asking what facts the jury had to find in order to convict, we look to the elements of the crime as defined by law, except that if the government did not object to jury instructions containing additional requirements, it is required to prove those too. *See United States v. Romero*, 136 F.3d 1268, 1271–73 (10th Cir. 1998).

Our review is narrow in scope. With respect to jury instructions, we can consider only objections to the accuracy of instructions that were raised before the trial court (or constitute plain error—which we do not find here) and with respect to the refusal of the district court to issue other instructions, we are limited to those actually requested by a party. *United States v. Crockett*, 435 F.3d 1305, 1314 (10th Cir. 2006). Moreover, on a sufficiency challenge, we must view

the evidence in the light most favorable to the government, and reverse only if no rational jury could have found the evidence sufficient to convict beyond a reasonable doubt. *United States v. Brown*, 200 F.3d 700, 704–05 (10th Cir. 1999). This is a highly deferential standard.

Mr. Nacchio was convicted under 15 U.S.C. §§ 78j, 78ff, and 17 C.F.R. §§ 240.10b-5, and 240.10b5-1. These statutes delegate the power to define criminal liability to the Securities and Exchange Commission by forbidding anyone from willfully using, "in connection with the purchase or sale of any security, . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). Those rules and regulations in turn prohibit trading a security "on the basis of material nonpublic information about that security . . . in breach of a duty of trust or confidence." 17 C.F.R. § 240.10b5-1(a). In other words, it is a crime for a corporate insider to "trade[] in the securities of his corporation on the basis of material, nonpublic information." *United States v. O'Hagan*, 521 U.S. 642, 651–52 (1997).

Mr. Nacchio challenges his conviction in three different respects. First, he argues that the undisclosed information on which he was alleged to have traded was not material. Second, he argues that he did not act with willful intent. Third, he argues that, as a matter of law, even if the information he had was material it was not a factor in his decision to trade. In explaining why these challenges fail,

-33-

we will first examine the instructions the jury was given on each legal issue—materiality, scienter, and the connection of the inside information to the trades—and provide our interpretation of the governing law.  Then we will explain why the government's evidence was enough that a properly-instructed jury could have found Mr. Nacchio guilty.

## A.  Materiality

The prohibition against insider trading applies only to those who trade on the basis of material undisclosed information.  The parties do not contest that the basic test for the materiality of inside information is whether there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).  The Supreme Court has stated that this inquiry is "fact-specific" and "depends on the significance the reasonable investor would place on the withheld . . . information."  *Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988).  Essentially, "materiality will depend at any given time upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity."  *Id.* at 238 (internal quotation marks omitted).  That is, information about future events is material if—taking into account both the probability of those events and their potential importance—a reasonable investor would regard the information as "significantly" different from

the information already made public.[7]  Corporate insiders must disclose what

material nonpublic information they possess or else to abstain from trading.  *See*

*Chiarella v. United States*, 445 U.S. 222, 226–29 (1980).

## 1.  Jury Instructions

We review "'the instructions as a whole de novo to determine whether they

accurately informed the jury of the governing law.'"  *United States v.*

*McClatchey*, 217 F.3d 823, 834 (10th Cir. 2000) (quoting *United States v.*

*Cerrato-Reyes*, 176 F.3d 1253, 1262 (10th Cir. 1999)).  We then review any

instructions offered by the defendant and rejected by the court.  "A defendant is

entitled to an instruction on his theory of the case if the instruction is a correct

statement of the law, and if he has offered sufficient evidence for the jury to find

in his favor."  *Crockett*, 435 F.3d at 1314.  We review a district judge's refusal to

issue a requested instruction under this standard for abuse of discretion.  *Id.*

Unopposed instructions are reviewed only for plain error.  *Medlock v. Ortho*

*Biotech, Inc.*, 164 F.3d 545, 553 (10th Cir. 1999).

In light of the fact-specific nature of the materiality determination it is

important to give a jury enough guidance to sort out material information from

noise.  It is difficult for untrained jurors to judge *ex post* what would have been

important to reasonable investors *ex ante*.  After the fact, whenever anybody has

---

[7] Both *Basic Inc.* and *TSC Industries* were civil cases, but the Court refused
to "vary[] the standard of materiality depending on who brings the action or
whether insiders are alleged to have profited."  *Basic Inc.*, 485 U.S. at 240 n.18.

made money trading stock it is easy to say that one would have wanted to know whatever the trader knew.

Here, the district court orally instructed the jury as follows:

"Material," in order to—for you to find a material matter or a material omission, the Government must prove beyond a reasonable doubt that the matter misstated or the matter omitted was of such importance that it could reasonably be expected to cause a person to act or not to act with respect to the securities transaction at issue.
Information may be material even if it relates not to past events, but to forecasts and forward-looking statements, so long as a reasonable investor would consider it important in deciding to act or not to act with respect to the securities transaction at issue.
The securities fraud statute under which these charges are brought is concerned only with such material misstatements or such material omissions and does not cover minor or meaningless or unimportant matters or omissions.
So the test is whether the matter misstated or the matter omitted was of such importance that it could reasonably be expected to cause a person to act or not to act with respect to the securities transaction at issue.

App. 4558–59.

We recognize that these instructions were adapted from a pattern instruction, *see* Kevin O'Malley, Jay Grenig & William Lee, *Federal Jury Practice & Instructions*, § 62.14 (5th ed. 2000), but they are not particularly informative. On appeal, the defendant suggests that the instructions should have incorporated the concepts of probability and magnitude, *see Basic, Inc.*, 485 U.S. at 238, and "total mix," *TSC Indus.*, 426 U.S. at 449, to further illuminate the concept of materiality, but he did not request such instructions when he had a chance in trial court to do so. Nor did he request any instruction informing the

jury of the SEC's regulatory guideposts regarding materiality. The question before us is therefore whether the instructions Mr. Nacchio did receive misstated the law. They did not. The Supreme Court has said that the "significance the reasonable investor would place on the withheld . . . information," is the test for materiality, *Basic Inc.*, 485 U.S. at 240, and that is what the jury was instructed.

The defendant did request two instructions about materiality, but they were not "correct statement[s] of the law." *Crockett*, 435 F.3d at 1314. First, he requested an instruction about materially misleading forward-looking statements, based on the requirements of a different rule, Rule 10b-5. This Rule makes it a crime "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made . . . not misleading . . . in connection with the purchase or sale of any security." 17 C.F.R. 240.10b-5(b). The defendant proposed a jury instruction based on the theory that if the nondisclosure of information regarding the IRU sales did not render Qwest's public projections affirmatively misleading under Rule 10b-5, that information must not have been material for purposes of insider trading regulations.

Much of the instruction Mr. Nacchio proposed is simply confusing. For example, it would have provided: "A forward-looking statement of the type conveyed to the public by Qwest and Mr. Nacchio on or about September 7, 2000, cannot be considered by you to be 'material' under the law unless it is shown that

the statement was made or reaffirmed without a reasonable basis or was disclosed other than in good faith." App. 755–56. But the materiality issue in the case was whether the *inside* information was material; nobody had attempted to deny that the public guidance was material, and it is not clear what that would mean. Moreover, when public guidance is "made or reaffirmed without a reasonable basis" that does not mean the guidance is "material." *Id.* at 756. It means that the guidance is *misleading*. This nonsensical syntax alone would have been a valid reason to reject Mr. Nacchio's instruction.

The proposed instruction went on to state: "Even if some of [Qwest's] internal projections conflicted with its publicly-issued projections or guidance that information would not be considered material, and Qwest and Mr. Nacchio would only be required to disclose such tentative internal projections that conflicted with the published projections if the internal figures were so certain that they show the published figures to have been without a reasonable basis." *Id.* at 757. In support of this instruction, the defendant relies on a number of cases limiting liability for false statements of material fact to cases where those statements were made without a reasonable basis or in bad faith. We do not think those cases apply in this context.

The SEC has promulgated a rule, called Rule 175, specifically designed to provide a safe harbor for "forward-looking statement[s] . . . filed with the [SEC]." Such a statement will "be deemed not to be a fraudulent statement. . . unless it is

shown that such statement was made or reaffirmed without a reasonable basis or was disclosed other than in good faith." 17 C.F.R. § 230.175.[8] Until the adoption of Rule 175, the SEC had discouraged firms from making future projections at all, and encouraged them to comment only on hard data about the present and past. Rule 175 was adopted to encourage companies to make estimates. Without it, as Judge Easterbrook has asked, "What's in it for them? If all estimates are made carefully and honestly, half will turn out too favorable to the firm and the other half too pessimistic. In either case the difference may disappoint investors, who can say later that they bought for too much . . . or sold for too little . . . ." *Wielgos v. Commonwealth Edison Co.* 892 F.2d 509, 514 (7th Cir. 1989).

Mr. Nacchio is being prosecuted for concealing true information while trading, not for making misleading statements. Nonetheless, he argues that a similar safe harbor rule must extend to his actions. However, Rule 175 and the insider trading rules are conceptually distinct. The insider trading duty is to disclose *or* abstain. The "or" in this formulation implies there are cases where corporate officials are permitted not to disclose, so long as they refrain from buying or selling stock. The defendant's theory collapses the two: only when it would be affirmatively misleading not to disclose, he argues, may liability attach

---

[8] Rule 175 applies to liability under the Securities Act of 1933; a second rule, 17 C.F.R. § 240.3b-6, provides identical protection from liability for misleading statements under the Securities Exchange Act of 1934, the statute that also criminalizes insider trading.

for failing to abstain. That is not the law. After all, Rule 10b-5 makes it a crime "to omit to state a material fact" *only* if that fact is "necessary in order to make the statements made . . . not misleading." 17 C.F.R. 240.10b-5(b). This presupposes that it is possible for omitted facts to be material even though the public statements do not mislead.[9]

The purpose of the reasonable basis principle reinforces our conclusion that it does not necessarily apply to insider trading cases, as opposed to false-statements cases. The rule exists to encourage companies to disclose estimates regarding future performance by protecting companies and their officers from liability so long as their estimates had a reasonable basis. But in an insider trading case, the reason to create a safe harbor for public statements—to encourage companies to make predictions—does not apply. Decreeing this information immaterial would mean that insiders could trade *without* disclosing it. This would turn the purpose of Rules 175 and 3b-6 on its head by sheltering those who keep predictions quiet, rather than rewarding them for disclosure. We are therefore not persuaded that the reasonable basis principle should apply to guard undisclosed information rather than disclosed projections.

The defendant also requested an instruction that if his public predictions and disclosures were "accompanied by warnings and cautionary language which

_____

[9] For this reason, *Wielgos*, on which the defendant relies, is distinguishable: the defendant in *Wielgos* was charged with making false statements in its prospectus, not with insider trading.

provide the investing public with sufficiently specific risk disclosures," he could not be convicted. App. 758. This is known as the "bespeaks caution" doctrine, also borrowed from false-statements cases. *See Grossman v. Novell, Inc.*, 120 F.3d 1112, 1120 (10th Cir. 1997). The defendant's argument to apply this doctrine to insider trading fails for the same reason as his reliance on the reasonable-basis doctrine: it confuses the relationship of misleading public projections and material inside information.

The "bespeaks caution" rule is an application of the common-sense principle that the more a speaker qualifies a statement, the less people will be misled if the statement turns out to be false. Or as we put it in *Grossman*, "[a]t bottom, the 'bespeaks caution' doctrine stands for the 'unremarkable proposition that statements must be analyzed in context' when determining whether or not they are materially misleading." 120 F.3d at 1120 (quoting *Rubinstein v. Collins*, 20 F.3d 160, 167 (5th Cir. 1994)). This rule does not apply here. First, there is no indication in the record that Qwest's public guidance and Mr. Nacchio's April 2001 reaffirmation of it to investors was so shrouded in cautionary language that the doctrine is applicable. Second, even if the public guidance were sufficiently hedged by cautionary language that the public knew to be wary of relying on it, this does not mean that the inside information on which Mr. Nacchio is alleged to have traded is immaterial. Certain and sure information that a company will experience a revenue shortfall might be material even if initial revenue

projections had been expressed in cautious tones. Information is material if it adds materially to the mix of information already available to investors. *TSC Indus. v. Northway*, 426 U.S. 438, 449 (1976). That the information already made available was couched in warnings does not make new information (such as that IRUs constitute a dangerously high part of revenues and that opportunities for new IRU sales were drying up) immaterial. The issue in this case is not whether Qwest's public guidance was materially misleading, but whether the undisclosed information on which Mr. Nacchio allegedly traded was material.

Whatever improvements might have been made in the instructions, the defendant was not entitled to the instructions that he asked for, and the instructions he ultimately received were not legally incorrect.

### 2. Sufficiency of the Evidence

Even if his legal theory of materiality is rejected, the defendant argues that the government failed to provide sufficient evidence that his information was "significan[t to] the reasonable investor." *Basic Inc.*, 485 U.S. at 240. As the government tells it, Mr. Nacchio knew in late 2000 that there were risks associated with his projections. If certain things went wrong, Qwest would not meet its public projections. By April 2001, Mr. Nacchio had learned that those things *had* gone wrong or at least were much more likely to. Mr. Nacchio responds that even if all of this is true, the total effect on Qwest's stock price would be too small to be significant as a matter of law.

Courts regularly look to the magnitude of a potential loss in determining whether knowledge of it is material. *See, e.g.*, *City of Phila. v. Fleming Cos.*, 264 F.3d 1245, 1268 (10th Cir. 2001) (refusing to allow a suit for failing to disclose a lawsuit whose threatened damages "totaled only 2.4%–3.5% of Fleming's total assets and approximately 10% of Fleming's total net worth"); *In re Apple Computer, Inc.*, 127 F. App'x 296, 304 (9th Cir. 2005) (unpublished) ("[Revenue] projections which are missed by 10% or less are not generally actionable."). But we have found no case that adheres rigidly to a mathematical threshold.

We take our cue from the SEC's guidelines for the materiality of errors in reported revenues. *See* Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45,150 (1999). In that bulletin, the accounting staff applied the principles of *TSC Industries* and *Basic, Inc.*, to assess the common "rule of thumb" among accountants "that the misstatement or omission of an item that falls under a 5% threshold is not material in the absence of particularly egregious circumstances." *Id.* at 45,151 (footnote omitted). The staff blessed the rule of thumb so long as it was not used too rigidly:

> The use of a percentage as a numerical threshold, such as 5%, may provide the basis for a preliminary assumption that—without considering all relevant circumstances—a deviation of less than the specified percentage with respect to a particular item on the registrant's financial statements is unlikely to be material. The staff has no objection to such a "rule of thumb" as an initial step in assessing materiality. But quantifying, in percentage terms, the magnitude of a misstatement is only the beginning of an analysis of

> materiality; it cannot appropriately be used as a substitute for a full analysis of all relevant considerations.

*Id.* Thus, a 5% numerical threshold is a sensible starting place for assessing the materiality of Mr. Nacchio's information about risks to Qwest's revenue guidance, but it does not end the inquiry. Special factors might make a smaller miss material. *See Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162–64 (2d Cir. 2000) (holding on the basis of Staff Accounting Bulletin No. 99 that "numerical benchmark[s]" are informative but not the "exclusive" test).

The parties dispute the size of the potential shortfall predicted to Mr. Nacchio by Qwest staff in April, 2001. The defendant claims this figure is $300 million, or 1.4% of total revenues (as measured by the bottom of the range presented in the public guidance). The government contends the figure is $900 million, or 4.2% of total revenues. The dispute revolves around interpreting testimony given by Qwest's vice-president of financial planning, Robin Szeliga. She is the official who told Mr. Nacchio about the risks to the public projections. On direct examination, when she first discussed her December/January meeting with Nacchio, Ms. Szeliga testified that "we aggregated all the risk they were identifying, we were still at this time coming to a billion dollars of risk as it related to the target that we had set." App. 2134. This testimony was ambiguous because there were both public projections and internal targets, as mentioned above. Furthermore, in September when Ms. Szeliga had received the memo she

was telling Mr. Nacchio about, the memo used estimates for the public guidance and internal targets that were different from the ones the company eventually set. In the memo, the internal target was predicted to be $22 billion (rather than 21.8) and the "street" target was to be $21.6 billion (rather than 21.3).

On cross-examination, Ms. Szeliga appeared to testify that she meant one billion dollars less than the internal target of $22 billion:

> Q. Okay. Now when you were talking about a billion dollar risk that all of these folks were debating and discussing, that was a billion dollar risk in their view at the time to the internal budget which was $21,991,000,000. That's true, isn't it?
>
> A. In the—yes, in the original, we showed that as it rounded up to $22 billion.

App. 2268. That testimony would support the defendant's $300 million figure, because $21 billion is $300 million less than the bottom of the public guidance. However, on re-direct examination, Ms. Szeliga corrected herself (without saying so), stating that the risk was closer to $1.2 billion and that it was against the public target at the time, not the private one:

> Q. [I]f you can highlight the 1,192,000,000, what does Mr. Bickley describe that as?
>
> A. Grand total risk in street disclosures, 1,192,000,000.
>
> Q. I'm going to round that to 1.2 billion; is that fair?
>
> A. Yes.
>
> Q. And I'm going to call that risk. So when I take the street, according to this memo, minus the risks, what do I come to?

A.  20 billion .4.

Q.  20.4 billion, all right.  Street minus the risk is 20.4 billion.  And I want to compare that to the guidance that Mr. Nacchio gave to the street two days after this, okay.

A.  Okay.

.   .   .

Q.  And how does this number, 20.4 billion, compare to the low end of the guidance that Mr. Nacchio disclosed to the street?

A.  About $900 million lower.

App. 2423–24.

For two reasons, we conclude that $900 million—the figure the government stressed in closing argument—is the one we must consider on appellate review. First, the memo itself explicitly refers to the $1.2 billion as a risk "in street disclosures," consistent with Ms. Szeliga's re-direct testimony.  App. 4936.  It is true that Ms. Szeliga testified that Mr. Nacchio never saw the memo, but she was talking to him about its contents, so it is helpful to compare her testimony to the document she was describing.  Second, we are required to interpret the evidence in the light most favorable to the government.  Given Ms. Szeliga's clarification on re-direct, the jury was entitled to believe that the higher figure was accurate.

Thus, we are asked to decide whether a risk that a company's revenue will fall $900 million short of its public guidance—a 4.2% shortfall—is necessarily immaterial to investors.  Although it is a close question, we conclude that the

-46-

answer is "no." The 4.2% shortfall is close to the 5% rule of thumb embraced by the SEC, and there was enough evidence of additional factors that we cannot reject the possibility of materiality as a matter of law. *See Ganino*, 228 F.3d at 162–64; Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45,150 (1999). The government argued that the shortfall had particular salience given the state of the economy and the industry. Mr. Nacchio himself had said in January that the "skittish market" was so "mercurial" that even a $50 million shortfall could create a 15–20% drop in stock price. Aplee.'s Supp. App. exh. 559A. We think that if the evidence is viewed in the light most favorable to the government, a reasonable and properly-instructed jury could have concluded that information about a 4.2% shortfall, in the special circumstances of this case, was material.[10]

Finally, Mr. Nacchio also points out that there is no evidence that Qwest's stock fell at the time when he released information about the IRUs. Ordinarily, that would be powerful evidence that the information was not significant to investors. But the government argues that this is because Mr. Nacchio "trickled out" the information so as to avoid a major market shock. Aplee's Br. 31. According to Lee Wolfe's testimony, before August some investors were already

_____

[10] We do not disregard the other component of materiality analysis with respect to foreward-looking statements, which is the probability that the event will occur. *See Basic, Inc.*, 485 U.S. at 238. But in this case the parties have focused solely on the magnitude of the shortfall, should it occur. *See* Aplt's Br. at 24 (arguing that the risk was too small to be material "[e]ven if the jury thought that 'risk' was a *certainty*").

skeptical of Qwest's revenue because of the company's refusal to disclose information about IRUs.  Then on August 7, Mr. Nacchio told investors in Boston that a disclosure about IRUs would be forthcoming.  A week later, Qwest filed an SEC disclosure reporting how much of its revenue for the first two quarters came from one-time sources, and Mr. Wolfe testified that "investors were very surprised by the magnitude," notwithstanding that there had been "some disclosure after the first quarter."  App. 1673.  It also bears noting that Mr. Nacchio's million dollars in sales may have warned alert investors that prospects for the company were not as bullish as he was saying.  From all of this, the jury could have concluded that Qwest's stock price incorporated the information in phases.

Thus, the evidence the government produced at trial was enough for a reasonable jury, properly instructed, to find Mr. Nacchio's information to be material.

### B.  Scienter

In addition to arguing that the information he possessed was not material, Mr. Nacchio argues that he traded in good faith and did not "willfully" violate the law, as the statute requires.  15 U.S.C. 78ff(a).

### 1.  Jury Instructions

The district judge charged that:

[T]he defendant must have committed these acts willfully, knowingly and with the intent to defraud.

I will now define what I mean by these terms.

An intent to defraud or an intent to deceive, manipulate or defraud is established if the Government proves beyond a reasonable doubt that the defendant acted knowingly with the intention or purpose to deceive or cheat.

To act willfully means to act voluntarily and purposefully with the specific intent to do something which the law forbids. That is to say, with bad purpose, to disobey, or disregard the law.

The term "knowingly" as used in these instructions to describe the alleged state of mind of the defendant means that he was conscious and aware of his action, realized what he was doing or what was happening around him, and did not act because of ignorance or mistake or accident or carelessness.

The good faith of the defendant is a complete defense to the charge of securities fraud contained in each count of this Indictment because good faith on the part of the defendant, if it is found by the jury, is simply inconsistent with the intent to defraud alleged in each charge of the Indictment.

A person who acts on a belief or an opinion honestly held is not punishable under this statute merely because the belief or opinion turns out to be inaccurate, incorrect or wrong. An honest mistake in judgment does not rise to the level of criminal conduct.

A defendant does not act in good faith if even though he honestly holds a certain opinion or belief if he also knowingly employs a device, scheme or artifice to defraud.

The law is written to subject criminal punishment only those [sic] people who knowingly defraud or attempt to defraud.

While the term "good faith" has no precise definition, it encompasses among other things a belief or opinion honestly held, an absence of an intention to defraud, and an intention to avoid taking unfair advantage of another.

The burden of proof is not on Mr. Nacchio to prove his good faith since the defendant has no burden to prove anything.

Rather, the Government must establish beyond a reasonable doubt the opposite of bad [sic] faith. That is, he acted with the intent to defraud charged in the Indictment.

If the evidence in the case leaves you with a reasonable doubt as to whether Mr. Nacchio acted with the intent to defraud or in good faith, then you must acquit him.

App. 4560–62.

This instruction defines the word "willfully" as "the specific intent to do something which the law forbids. That is to say, with bad purpose, to disobey, or disregard the law." *Id.* at 4560. The government objected that this instruction was too generous to Mr. Nacchio, arguing that the court should apply the standard used by the Supreme Court in interpreting a firearm licensing statute: "As a general matter, in the criminal context, a 'willful' act is one undertaken with a 'bad purpose.' In other words, in order to establish a 'willful' violation of a statute, the Government must prove that the defendant acted with knowledge that his conduct was unlawful." *Bryan v. United States*, 524 U.S. 184, 191–92 (1998) (internal quotation marks and footnote omitted). We need not decide which version of this instruction is a more accurate interpretation of 15 U.S.C. §78ff, because Mr. Nacchio does not challenge the instruction and the evidence was sufficient to convict him under either version.

Mr. Nacchio does challenge the portion of the instruction that discusses good faith, however. The instruction states that having good faith makes one innocent of insider trading, but that knowingly engaging in insider trading negates good faith. This may sound circular, but it expresses an important point. If the defendant was simply too bullish about Qwest's prospects, this does not make him guilty of insider trading; however, if he knew that he was more optimistic than

the market, and that the market would devalue Qwest stock if it knew what he knew, he is not exonerated by his bullishness.

The defendant complains that the jury was misled by this sentence of the good-faith instruction: "A defendant does not act in good faith if even though he honestly holds a certain opinion or belief if he also knowingly employs a device, scheme or artifice to defraud." App. 4561. He claims that the instruction allowed the jury to conclude that Mr. Nacchio acted in bad faith on the basis of dishonesty totally unrelated to the crime he was charged with. But the judge also charged the jury that "[a]n intent to defraud or an intent to deceive, manipulate or defraud" discussed in the good-faith instruction was relevant because "the defendant must have committed *these acts* willfully, knowingly and with the intent to defraud." *Id.* (emphasis added). Therefore, while they might have been clearer, the bad-faith instructions were limited to the crimes charged and did not allow the jury to hold Mr. Nacchio accountable for irrelevant conduct.

## 2. Sufficiency of the Evidence

The evidence at trial was enough for the jury to infer that Mr. Nacchio acted with the purpose to disobey the law or the knowledge that he was doing so. Lee Wolfe testified about a conversation he had with Mr. Nacchio regarding "the impact of disclosure of the use of one-timers" on the market. App. 1653. He testified that he and Mr. Nacchio discussed that "[t]he likely reaction was that . . . [analysts] would be surprised at the magnitude of the transactions, and that the

stock price would go down some amount." *Id.* In addition, Mr. Wolfe testified that when Qwest ultimately decided to lower its public guidance, Mr. Nacchio and Drake Tempest agreed that "there needed to be enough time" between the lowering of the guidance and the IRU disclosures Mr. Nacchio had made in August. *Id.* at 1677. This was "to give the sense that this was something new that caused the lowering of the targets . . . so that investors would accept the notion that lowering the targets was something that . . . Mr. Nacchio would not have reasonably known when he made the statements in Boston." *Id*. at 1677–78. This can be interpreted as an effort to conceal the importance of the IRU information. Finally, the jury heard this testimony from Mr. Wolfe on cross-examination:

> Q. Now, what did Mr. Nacchio tell you in response to your concerns that were raised by the analysts about these one-time transactions? What was his response to you?

> A. Well, as I testified earlier, there were different responses in terms of what the impact on the stock price would be. A couple of other times he would say, you know, why do they need to know? And I would say, to make an informed decision whether to buy or sell the stock. And basically, he responded, screw them, go tell them to buy.

App. 1798–99. The jury was entitled to believe Mr. Wolfe and to conclude from his testimony that Mr. Nacchio knew that the information he had was material to the market.

As general counsel, Mr. Tempest approved Mr. Nacchio's sales plans in February and May of 2001, and determined that they were consistent with the

company's insider trading policy. The jury convicted Mr. Nacchio of his trades executed pursuant to the May but not the February plan. Mr. Nacchio argues that he should have also been acquitted of his trades under the May plan because Mr. Tempest's approval of the plan constituted evidence that Mr. Nacchio did not willfully break the law. However, based on the evidence that Tempest and Nacchio discussed concealing the importance of the IRUs, the government argued that the jury should discredit his approval. Mr. Tempest did not testify. A reasonable jury could believe that Mr. Tempest's signature was not conclusive evidence of Mr. Nacchio's good faith. The defense was permitted to put its argument regarding Tempest's approval to the jury; it was not entitled to judgment as a matter of law. Further, a reasonable jury could believe that by the time Mr. Nacchio entered into the May plan, his scheme to defraud investors had already begun and Mr. Nacchio's use of the May plan, notwithstanding Mr. Tempest's approval of it, was thus part of an attempt to conceal that scheme.

## C. Trading on the Basis of Inside Information

Finally, Mr. Nacchio also argues that because he had an innocent explanation for his trades, the jury could not have concluded that his trades were "on the basis of" inside information. 17 C.F.R. § 240.10b5-1(a).

### 1. Jury Instructions

Over the government's objection, the judge charged the jury:

A person trades on the basis of inside information if the Government proves beyond a reasonable doubt that the person actually used material non-public information in deciding to trade. It is not sufficient for an insider merely to have possessed the material non-public information when he traded.

The inside—the test here is really one of cause. The inside information need not have been the sole cause of the trade. There may be other causes for the trade as well. It is sufficient that the inside information was a significant factor in an insider's decision to sell stock. A significant factor.

App. 4559.

This instruction was arguably incorrect because it was too favorable to Mr. Nacchio. Since 2000, Rule 10b5-1 has provided that an insider trades "on the basis of" information so long as he is "aware" of it, 17 C.F.R. §240.10b5-1(b), unless he falls into one of the rule's safe-harbors—the creation of an automatic trading plan or some other binding contract or election to sell stock in advance of acquiring the information. *Id*. § 240.10b5-1(c). This would make Mr. Nacchio liable even if he could prove that he had unrelated reasons for his sales (such as the need to dispose of options before their expiration date) and thus that he did not trade "on the basis of" the information. In overruling the government's objection to the "significant factor" and "actually used" requirements, the district judge relied on the Ninth Circuit's decision in *United States v. Smith*, 155 F.3d 1051, 1067 (9th Cir. 1998), which was decided before Rule 10b5-1 was enacted. When the government pointed out that *Smith* did not apply because "it precedes the rule in issue in this case," the judge responded, "I don't think it makes any

-54-

difference. I think it's still good law," providing no further explanation. App. 4165–66.

By so ruling, the district court may have implicitly held that Rule 10b5-1 is not a lawful interpretation of the securities laws, at least if it means, as it appears to say, that the affirmative defenses it gives to awareness liability are exclusive. The statute under which insider trading is prosecuted is limited to "manipulative or deceptive" conduct. 15 U.S.C. § 78j(b). Some commentators maintain that the Rule (the authority of which has not been resolved by any circuit) is unlawful because it effectively eliminates fraud from the liability standard. *See* Carol B. Swanson, *Insider Trading Madness: Rule 10b5-1 and the Death of Scienter*, 52 U. Kan. L. Rev. 147 (2003). However, on appeal, Mr. Nacchio has not attempted to defend the judge's instruction on this unarticulated ground, so we assume, without deciding, that Rule 10b5-1 is lawful.[11] If so, then the district court's instruction was more generous than Rule 10b5-1 provides.

Thus, the government's objection below to the court's instruction is significant for our analysis of the sufficiency of the evidence. When conducting such analysis, we normally look to what the law actually requires rather than what the jury was instructed so long as the government objected to the instruction

---

[11] Mr. Nacchio submitted a proposed jury instruction more favorable than the one he received. In a footnote to that submission, he suggested that Rule 10b5-1 was invalid by citing Stuart Sinai, *A Challenge to the Validity of Rule 10b5-1*, 30 Sec. Reg. L.J. 261 (2002). However, in this appeal he does not argue that his instruction was improperly denied, or that Rule 10b5-1 is invalid.

below.  *United States v. Williams*, 376 F.3d 1048, 1051–52 (10th Cir. 2004).  In this case, however, the government's proffered instruction said that the jury must find that the information was "a factor, however small, in the insider's decision to buy or sell."  App. 743.  Mr. Nacchio argues that because the government proffered this instruction, it must be held to no less stringent a standard on review of sufficiency of the evidence.  It is not clear to us that the government must be held to its *rejected* jury instructions.[12]  We do not need to resolve the conundrum here, because the evidence was sufficient to establish both that Mr. Nacchio was aware of the information, and that it was "a factor, however small," in his decision to trade.  Because Rule 10b5-1 is unchallenged here, we do not decide whether the evidence is sufficient to demonstrate that Mr. Nacchio actually used inside information, or that it was "a significant factor," as the judge instructed.

## 2.  Sufficiency of the Evidence

The defendant urges that his April and May 2001 sales could not have been "on the basis of" his inside knowledge because he had an entirely innocent explanation: he had to exercise his stock options before they expired in June

---

[12] We have described our rule about the role of uncontested jury instructions in sufficiency-of-the-evidence review both as an application of "the doctrine of law of the case" and as "an equitable remedy whose purpose is to prevent the government from arguing on appeal a position which it abandoned below."  *Williams*, 376 F.3d at 1051.  On one hand, law of the case normally applies only to issues "[a]ctual[ly] deci[ded]," 18B Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, *Federal Practice and Procedure* § 4478, at 649 (2d ed. 2002), not to arguments that are rejected.  On the other, the equitable theory might apply to proffered as well as accepted instructions.

2003. But this is not enough to exclude as a matter of law the possibility that inside information was a factor. The fact that his options were expiring means that he had to *exercise* them, but after exercising an option and receiving a share one can either sell that share or hold it. When announcing his intention to start redeeming his stock options in October, Mr. Nacchio said, "I can't just exercise and hold," explaining that because he would be taxed upon exercising his options, he had to sell them to pay the tax. Aplee.'s Supp. App. exh. 1560. That is a plausible explanation, but the jury did not have to believe it. Mr. Nacchio could have paid the tax out of other assets, or sold only some of the shares, using the proceeds to pay the tax due on the options. Mr. Nacchio also argues that, customarily, CEOs sell stock as soon as they exercise an option. These are powerful arguments for the jury, but they do not establish his innocence as a matter of law.

Mr. Nacchio also argues that his pattern of sales exonerates him and requires us to overturn the jury's verdict. He cancelled his February automatic sales plan in March because Qwest's share price went below $38, and his May plan included a $38 floor. He never sold any more stock after May, and ended the year with more vested options than he owned at the beginning. On its face, this is curious behavior for somebody with inside knowledge that the stock price was likely to plummet. However, the law does not require a defendant to sell most of his stock to be convicted of insider trading. The government argued that Mr.

Nacchio stopped selling in May "to avoid detection," Aplee's Br. at 25, and a reasonable jury could have believed this.

In any event, the jury convicted Mr. Nacchio only on trades beginning April 26, acquitting him on trades from January 2 through March 1 (he did not trade between March 1 and April 26), suggesting that the jury acknowledged his legitimate reasons for exercising his options prior to April. By convicting Mr. Nacchio for his April and May trades, it appears the jury was convinced that he sold stock in April and May because he knew at that time that Qwest had not made the necessary shift to recurring revenue. Mr. Nacchio knew the 2001 budget required Qwest to double its 2000 growth rate for recurring revenue, he knew and agreed that such growth had to happen as early as possible in 2001 to benefit from sufficient compounding, and he knew Qwest's 2001 budget relied on such compounding to generate increased revenue in the third and fourth quarters. Further, as of April 9—after he had abandoned his February trading plan—Mr. Nacchio knew that this needed shift had not occurred, as recurring revenue was off its target by 19%. A reasonable jury could infer from these facts that, notwithstanding Ms. Szeliga's report that the company was on track to make its year-end public target, Mr. Nacchio knew in April that the company's earnings were in jeopardy, and that he acted upon this nonpublic information when deciding to trade in April and May.

## IV. RETRIAL

-58-

The improper exclusion of Professor Fischel's testimony prejudiced Mr. Nacchio's defense, so we must reverse his conviction. However, because the evidence the government presented was sufficient, the government may try him a second time. Because he will have to be sentenced anew if he is convicted again, we do not need to reach the challenges Mr. Nacchio raises to the forfeiture of his assets or his sentencing enhancement.

Finally, the defendant asks us to assign any new trial to a new district judge. In this Circuit, we exercise our power to do so only where we find either that the judge harbored "personal bias" or on the basis of circumstances laid out in a three-part test:

> (1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously-expressed views or findings determined to be erroneous or based on evidence that must be rejected, (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.

*Mitchell v. Maynard*, 80 F.3d 1433, 1448–50 (10th Cir. 1996) (quoting *United States v. Sears, Roebuck & Co.*, 785 F.2d 777, 780 (9th Cir. 1986)). We do not suggest that the assigned district judge harbored personal bias against Mr. Nacchio, but we do conclude that the factors outlined in *Mitchell* militate in favor of retrial before a different judge. After reading the trial transcript, we have concluded that it would be unreasonably difficult to expect this judge to retry the case with a fresh mind. Because the government will have to retry the case from

scratch either way, there is no unnecessary "waste [or] duplication" in reassigning it.

## V. CONCLUSION

The judgment of the district court is **REVERSED** and the case is **REMANDED** for a new trial before a different district judge.

07-1311, *United States v. Nacchio*

**HOLMES,** Circuit Judge, dissenting in part and concurring in part.


The majority elevates form over substance in concluding that Rule 16 was the foundation for the district court's exclusion of Professor Fischel's expert testimony. *Daubert* was at the heart of the district court's decision, and Mr. Nacchio was on clear notice of this fact. The court did not abuse its discretion in finding that Mr. Nacchio did not carry his burden under *Daubert* of establishing the admissibility of Professor Fischel's testimony. Accordingly, I respectfully dissent from Section II(A) of the majority's opinion. I concur with the majority's conclusion that Mr. Nacchio failed to establish grounds for reversal in the district court's exclusion of classified information and in its instructions to the jury. I also believe the evidence was legally sufficient to support the jury's verdict. Therefore, I would affirm the district court and uphold Mr. Nacchio's conviction.[1]


The district court's exclusion of Professor Fischel's testimony was about *Daubert*. True, the government first framed its challenge to Professor Fischel's proffered expert testimony as an objection to the sufficiency of Mr. Nacchio's Rule 16 disclosure. However, by the time the district court ruled to exclude

---

[1] In addition to challenging his conviction, Mr. Nacchio raised certain challenges to his sentence. I offer no views regarding the merits of those sentencing challenges.

Professor Fischel's testimony, it was clear that the court was asking about *Daubert*.

The district court had repeatedly questioned Professor Fischel's methodology—an issue that it must examine under *Daubert*, not Rule 16. Thus, Mr. Nacchio should have known that he had to either make the requested showing or request a *Daubert* hearing.[2]  Furthermore, it was incumbent upon Mr. Nacchio, who was offering Professor Fischel as an expert witness, to demonstrate that his proffered expert was qualified to render an expert opinion. Thus, when the district court was asking about methodology, Mr. Nacchio was required to rise to meet his burden of demonstrating that the expert testimony was admissible.

Mr. Nacchio is attempting to take an unexceptional issue and craft it into a tale of an invidious district court ruling.  However, it is clear that at best his argument is nothing more than a run-of-the-mill claim of unfair surprise clothed in Rule 16. We have dismissed similar claims when, as here, the record belies them.  *See Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 n.4 (10th Cir. 2001) (rejecting the contention that a party was not informed that her expert's qualifications would be at issue when, *inter alia*, a section of a motion in opposition to the expert raised the issue of the expert's qualifications); *see also*

[2]      I agree with the majority that *Daubert* is "legal shorthand for the district court's obligation to test a proposed expert's methodology in advance of his testimony."  Maj. Op. at 13.  Logically, it should follow, then, that a district court's repeated probing as to the sufficiency of an expert's methodology, as here, would put an expert witness's proponent on notice that *Daubert* was at issue.

*Solorio v. United States*, 85 F. App'x 705, 707-10 (10th Cir. 2004) (rejecting "essentially a claim of unfair surprise arising from the district court's exclusion of [] expert[] testimony" when, *inter alia*, "[t]he government's reply brief mounted an explicit *Daubert* attack" on the expert's reliability).

Mr. Nacchio was on notice that Professor Fischel's qualifications were at issue. As early as the government's first motion regarding Professor Fischel, the government argued that Rule 702 was implicated. Supp. App. at 39. At a March 22, 2007 hearing, both the government and the court raised the concern that there could be issues arising from the *Daubert* line of cases. Mr. Nacchio's counsel responded, "forewarned is forearmed." App. at 2042.

One week following this exchange, Mr. Nacchio provided his revised expert disclosure, and again, the government responded by raising *Daubert* concerns. The government filed a 63-page motion to exclude Professor Fischel's expert testimony based on deficiencies in the Rule 16 disclosure *and* based on Mr. Nacchio's failure to meet his burden to demonstrate that Professor Fischel's testimony was admissible. *See* App. at 363. The government argued that, in addition to Rule 16, there were numerous grounds for excluding Professor Fischel's testimony, including Rules 401, 403, 602, 702, and 703 of the Federal Rules of Evidence.

When Mr. Nacchio responded to this motion the next day, in substance, he addressed *Daubert* issues in discussing Rule 702 and Professor Fischel's

qualifications.[3] *See* App. at 463-68. Thus, as of his response on April 4, Mr. Nacchio was not only on notice that *Daubert* was in play, but he also had responded to the *Daubert* issues.

The following day (April 5), when Mr. Nacchio called Professor Fischel to the stand, he still had not met his burden of demonstrating that Professor Fischel's testimony was admissible. In particular, Mr. Nacchio had not even mentioned yet the possibility of a *Daubert* hearing. As the party offering the expert, Mr. Nacchio "bore the burden of demonstrating to the district court that [his proffered expert] was qualified to render an expert opinion." *Ralston*, 275 F.3d at 970 n.4. *See also* Fed. R. Evid. 702 advisory committee's note ("[T]he proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence.").

---

[3] The majority states that Mr. Nacchio made no mention of *Daubert* or Professor Fischel's methodology in this filing. Maj. Op. at 14. Although technically correct that the word "Daubert" is not included, this is one example of how the majority elevates form over substance. Mr. Nacchio's filing contains a section with the heading: "Professor's Opinions Are Proper Under Rule 702." App. at 466. In that section, Mr. Nacchio discusses the "specialized knowledge" that Professor Fischel will purportedly bring to the jury and the analytic approach toward the stock and "other financial data" he has taken to "formulate opinions" (i.e., his methodology). *Id.* Thus, contrary to the majority's assertion, Mr. Nacchio's filing did address *Daubert* and Professor Fischel's methodology. *See Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 588 (1993) ("Here there is a specific Rule that speaks to the contested issue. Rule 702, governing expert testimony, . . . ."). In short, the substance of this filing underscores Mr. Nacchio's awareness that *Daubert* was in play.

The district court made a ruling excluding that testimony *because* Mr. Nacchio had not met his burden of demonstrating admissibility. The Majority's contrary reading of the transcript misses the mark: The district court cannot reasonably be said to have "excluded the evidence on Rule 16 grounds alone." Maj. Op. at 22. This conclusion is particularly problematic in light of the Supreme Court's recent ruling in *Sprint/United Management Co. v. Mendelsohn*, No. 06-1221, 552 U.S. __, 2008 WL 495370 (Feb. 26, 2008). There, the Court instructed: "An appellate court should not presume that a district court intended an incorrect legal result when the order is equally susceptible of a correct reading, particularly when the applicable standard of review is deferential." *Sprint/United Mgmt. Co.*, 552 U.S. __, 2008 WL 495370, at *5. Here, we have a deferential standard of review, *see id.* at *4 (noting that there is broad discretion granted to a district court's evidentiary rulings), and a district court ruling that can be

interpreted as coming to a correct legal result.[4]  Accordingly, we should not presume that the district court erred in this way.

A fair reading of the district court's ruling indicates that *Daubert* was the driving force behind that decision. At that time, Mr. Nacchio had not demonstrated the admissibility of Professor Fischel's testimony.  Because Mr.

---

[4]    For example, after stating that Professor Fischel's testimony could be excluded on a number of grounds, the district court said: "Most convincingly, the defendant has made no attempt to comply with Rule 702 or *Daubert* and establish that Fischel's testimony is the product of reliable principles and methods or that Fischel applied some principles and methods reliably in this case." App. at 3915. The district court then stated: "Rule 702 governs this issue." *Id.*  This indicates that Rule 702 was the main rationale for the district court's decision.

As support for its interpretation of the record, the majority cites to two parts of the district court's ruling. Maj. Op. at 15.  In the first instance, the district court only refers generically to "disclosures" after outlining the contents of the government's motion and indicating it had also read both Mr. Nacchio's Rule 16 disclosure and his reply to the government's motion. App. at 3914. In the second instance, the district court stated that methodology was undisclosed "in *this* expert disclosure." App. at 3917 (emphasis added). However, the district court's previous discussion did not refer to the Rule 16 disclosures. Instead, the district court had just quoted Mr. Nacchio's argument—made in his reply to the government's motion to exclude the testimony—that Professor Fischel's opinions were proper under Rule 702. *Compare* App. at 3916 *with* App. at 466.

At best, the majority has pointed out two ambiguous references to a "disclosure" that arise in the context of the district court's assessment of the sufficiency of Mr. Nacchio's *Daubert* arguments. "When a district court's language is ambiguous, as it was here, it is improper for the court of appeals to presume that the lower court reached an incorrect legal conclusion." *Sprint/United Mgmt. Co.*, 552 U.S. __, 2008 WL 495370, at *5.  Although a fair reading of the district court's decision demonstrates that the basis for the ruling was *Daubert*, the Supreme Court's recent guidance further compels the conclusion that it is not proper for us to assume that the district court was basing this ruling on Rule 16.

Nacchio bore that burden, he "cannot now complain that []he was unprepared to attend to h[is] burden." *Ralston*, 275 F.3d at 970 n.4. Yet, this is essentially what Mr. Nacchio's argument boils down to.[5]

On April 9, the date that Professor Fischel—Mr. Nacchio's last witness—finished testifying as a summary witness, Mr. Nacchio requested a *Daubert* hearing *for the first time*. In a footnote of a motion to permit Professor Fischel to provide expert testimony to rebut two government witnesses, Mr. Nacchio asked the court to reconsider its ruling excluding Professor Fischel's expert testimony and noted that "[a]n evidentiary hearing is particularly appropriate" in situations where the court finds a report to be insufficiently detailed. App. at 481 n.4.  Even here, Mr. Nacchio failed to address the key concern that the district court had previously highlighted in excluding Professor Fischel's testimony—his methodology for this particular case.

---

[5]     The majority states that we should not "penalize" a party for failing to present an argument "[w]hen the court does not allow the lawyer" to present it. Maj. Op. at 25. However, this contention is based on one exchange between Mr. Nacchio's counsel and the district court following the court's ruling to exclude Professor Fischel's testimony and ignores the ample opportunities that Mr. Nacchio previously had to respond. Indeed, it ignores the written response that Mr. Nacchio had already made discussing Rule 702 and Professor Fischel's qualifications. Although Mr. Nacchio may have been on a tight deadline, he never requested a continuance or even a *Daubert* hearing before he called Professor Fischel to the stand. Both of these requests would have been rather simple and certainly would not have required much time at all.  Yet, Mr. Nacchio failed to make either request.

Neither the government nor the district court was under any obligation to call for a hearing or to prod Mr. Nacchio to supplement his filings. The majority suggests that the district court should have ordered Mr. Nacchio to make a *Daubert* proffer. Maj. Op. at 19, 21. However, we have never required a district court to inquire about *Daubert* issues.[6] Rather, as the proponent of the expert testimony, the admissibility burden of proof rested solely on Mr. Nacchio, and he had a multitude of opportunities to provide more information or even simply to request a hearing. He failed to do any of this. Furthermore, the district court clearly indicated on numerous occasions that it was concerned about Professor Fischel's methodology. Although the court did not specifically order a *Daubert* proffer, through its repeated questions on methodology, it effectively invited Mr. Nacchio to make one. The district court, which has great discretion in deciding what procedures to use in acting as gatekeeper, *see Rodriguez-Felix*, 450 F.3d at 1122, should not now be held to have erred because Mr. Nacchio failed to accept its invitation to alleviate its *Daubert* concerns.

---

[6] The majority also states: "The prosecution had every right to demand a *Daubert* hearing to test his methodology. " Maj. Op. at 21. Although it is true that the prosecution could have demanded a hearing, it was likewise under no obligation to do so. In a proffer of expert testimony, the burden is on the party offering the testimony. In this case, that burden was on Mr. Nacchio. Accordingly, when it became apparent that the district court was not convinced that Professor Fischel's testimony was admissible, Mr. Nacchio—not the prosecution—should have requested a *Daubert* hearing.

Mr. Nacchio's attempt to focus this court's attention on Rule 16, which certainly did not require him to demonstrate admissibility, should be unavailing. *Daubert* was the issue, and Mr. Nacchio failed in his *Daubert* obligation to establish the admissibility of Professor Fischel's testimony.

A district court's application of the *Daubert* standard is reviewed for abuse of discretion. *United States v. Rodriguez-Felix*, 450 F.3d 1117, 1122, 1125 (10th Cir.), *cert. denied*, 127 S. Ct. 420 (2006). The party offering the expert "must show that the method employed by the expert . . . is scientifically sound and that the opinion is based on facts which satisfy Rule 702's reliability requirements." *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003). *See also Ralston*, 275 F.3d at 970 n.4; Fed. R. Evid. 702 advisory committee's note. The district court has broad discretion in determining how to assess an expert's credibility. *E.g.*, *Rodriguez-Felix*, 450 F.3d at 1122. The exclusion of an expert is not overturned "unless it is arbitrary, capricious, whimsical or manifestly unreasonable or when we are convinced that the district court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1079 (10th Cir. 2006) (quoting *United States v. Gabaldon*, 389 F.3d 1090, 1098 (10th Cir. 2004)).

Before allowing expert testimony, the district court must satisfy itself that the proffered testimony is both relevant and reliable. *See, e.g.*, *Rodriguez-Felix*, 450 F.3d at 1122; *United States v. Fredette*, 315 F.3d 1235, 1239 (10th Cir.

-9-

2003). "The touchstone for relevance, in this context, is whether 'the evidence or testimony [will] assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Gabaldon*, 389 F.3d at 1098 (quoting *Daubert*, 509 U.S. at 591). In making a reliability determination, "[g]enerally, the district court should focus on an expert's methodology rather than the conclusions it generates." *Dodge*, 328 F.3d at 1222.

As to relevance, the district court stated that much of Professor Fischel's testimony was nothing but argument based on factual matters before the court, a summary of stock sales and prices, and issues within the common knowledge of the jury. Such reasons for excluding expert testimony are perfectly reasonable and, indeed, have been upheld by this court. *See Gabaldon*, 389 F.3d at 1099 (upholding the exclusion of expert testimony when it was "not something for which expert testimony is needed"); *Fredette*, 315 F.3d at 1240 (upholding the exclusion of expert testimony when it "did not deal with matters outside the everyday knowledge of a typical juror"). Furthermore, the district court noted that some evidence was completely irrelevant. For example, Professor Fischel was set to testify regarding what Michael Eisner and Michael Dell were doing with stock in their companies when Mr. Nacchio was selling his stock. In sum, the district court's conclusions are not so unreasonable that they exceeded permissible choice. It was certainly permissible for the district court to conclude that this evidence was not relevant.

The district court could have excluded Professor Fischel's testimony on grounds of relevance alone, but the court also noted concerns regarding Professor Fischel's methodology. The majority "conclude[s] that at a minimum it is an abuse of discretion to exclude an expert witness because his methodology is unreliable without allowing the proponent to present *any* evidence of what the methodology would be." Maj. Op. at 23-24. However, the record clearly establishes that Mr. Nacchio proffered information concerning Professor Fischel's methodology.[7] Indeed, Mr. Nacchio's counsel admitted as much. Oral Arg. at 47:19-47:48 (responding to a question about what methodology had been

---

[7] Without any legal support, the majority suggests that a district court cannot make a Daubert ruling without hearing testimony or receiving submissions. Maj. Op. at 22-23. However, we have never required a district court to *sua sponte* request either a hearing or more submissions and certainly no obligation of that sort would appear to exist in the *Daubert* context. Indeed, we have repeatedly held that "[t]he district court retains broad discretion in deciding how to assess an expert's reliability, *including what procedures to utilize in making that assessment*, as well as in making the ultimate determination of reliability." *Rodriguez-Felix*, 450 F.3d at 1122 (emphasis added) (citing *Dodge*, 328 F.3d at 1223). Contrary to the majority's contention, there was information before the district court on the question for decision—whether Professor Fischel's proffered expert testimony satisfied *Daubert*. Mr. Nacchio had submitted filings regarding Rule 702 and at least ten pages of methodology that the district court did review before excluding Professor Fischel's testimony. Furthermore, we place the burden on the party offering the expert testimony to demonstrate admissibility. *Ralston*, 275 F.3d at 970 n.4. *See also* Fed. R. Evid. 702 advisory committee's note. Accordingly, it was incumbent upon Mr. Nacchio to make the appropriate submissions, through a requested *Daubert* hearing or otherwise—particularly given that the district court had been drawing his attention to its concern over methodology. In other words, insofar as there were any gaps in the record before the district court when it made its *Daubert* ruling, Mr. Nacchio must be held responsible for them and should bear the adverse consequences of not filling them.

provided, Mr. Nacchio's attorney indicated: "He described in detail—at least ten pages of detail . . . . There's ten pages that's nothing but that."). Accordingly, by Mr. Nacchio's own admission, the district court had information about methodology in front of it when ruling on the issue.

In the "ten pages" of methodology offered by Mr. Nacchio, it is indicated that Professor Fischel was basing his opinion on his analysis of, *inter alia*, market and stock-related information. This indicates that Professor Fischel was applying his experience to material that he reviewed to formulate an opinion. A witness's testimony can rely solely on experience. However, when that is the case, "the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 advisory committee's note. Mr. Nacchio did not offer any of that additional information. "The trial court's gatekeeping function requires more than simply taking the expert's word for it." *Id.* (internal quotation marks and citation omitted). "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Mr. Nacchio seems to rely on Professor Fischel's qualifications to tip the balance in favor of the admissibility of his testimony. In doing so, he ignores that when assessing expert testimony, "the question before the trial court [i]s specific,

not general." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 156 (1999). Although Professor Fischel generally has been allowed to testify in the past and a district court might well respect his credentials, it has an obligation to assess the methodology that Professor Fischel has employed in the case at hand and whether he has specialized knowledge that can assist the jurors in that case. *See id.* at 153-56; *Rodriguez-Felix*, 450 F.3d at 1122; *Fredette*, 315 F.3d at 1239-40. Mr. Nacchio could not just assume that his expert would be admitted because his testimony was allowed in other cases; he had to meet his burden of demonstrating admissibility in this particular case. As the district court noted, Mr. Nacchio "made no attempt" to do this. App. at 3915.

Mr. Nacchio failed to satisfy the district court that Professor Fischel's testimony would be either reliable or relevant. The district court was well within its discretion in excluding Professor Fischel's expert testimony. *See Rodriguez-Felix*, 450 F.3d at 1125 (finding no abuse of discretion when the district court excluded testimony based on the "woefully inadequate" report regarding proffered testimony).

Of course, I would find it troubling if a district court unilaterally used a ruling regarding the propriety of a Rule 16 disclosure to effectively exclude an expert witness on *Daubert* grounds—without any notice to the party offering the expert. But that is not what happened here. Mr. Nacchio had ample notice that the methodology underlying Professor Fischel's opinion (i.e., a *Daubert* question)

-13-

was at issue and bore the burden of demonstrating that the testimony was admissible. He easily could have requested a hearing or fully addressed the issue in briefing. Mr. Nacchio failed to do so. Consequently, there is no foundation to his claim for a new trial.

I respectfully dissent and would affirm Mr. Nacchio's conviction.